## Martha Burk *v.* William E. Howley, appellant, Roger O'Mara and Henry Whitehouse.

*Arrest without warrant—Hearing.*

While an arrest on an exigency where reasonable grounds of suspicion exist may be made without a warrant, it is the duty of the person or officer making the arrest to take the accused before a magistrate for formal accusation and hearing before he shall have been locked up.

*False imprisonment—Evidence—Probable cause.*

In an action for false imprisonment, evidence as to a conversation between the plaintiff and the officer who arrested him, not in the presence of defendant, as to the appearance of the rooms burglarized, is inadmissible.

*Malicious prosecution—Arrest—Unjustifiable detention—Probable cause —Province of court and jury—Joint trespassers.*

Probable cause does not depend on the state of the case in point of fact, but on the honest and reasonable belief of the party prosecuting. What facts and circumstances amount to probable cause is a question of law; whether they exist in any particular case is a question of fact. When the facts are in controversy, the subject must be submitted to the jury, in which event it is the duty of the court to instruct them what facts will constitute probable cause, and submit to them only the question of such facts.

In an action for malicious prosecution, it appeared that the plaintiff, a colored woman, thirty years of age, had been in the service of defendant for about one week. While she was sole occupant of defendant's house, the

house was entered and a large quantity of silverware stolen.  On rising in the morning plaintiff immediately notified defendant who had been sleeping in the next house.  An officer was summoned who, in the presence of defendant, charged plaintiff with the theft.  She protested her innocence, but was arrested without a warrant, and detained in a stationhouse at the defendant's request for eight days.  Defendant knew that plaintiff had a good character.  The evidence showed that her detention was for the purpose of forcing her to confess guilt.  The officer who made the arrest testified that at the time of plaintiff's arrest defendant stated to the officer that some one inside the house must have opened it, and the plaintiff was the only one inside.  He gave no intimation to the officer of plaintiff's previous good character.  *Held*, (1) that it was not error for the court to charge that if the arrest was made at defendant's instance, with his knowledge and consent, it was sufficient, although he may not have expressly directed the officer to arrest the plaintiff; (2) that it was proper to charge that if defendant was a party to the detention of plaintiff in order to force a confession from her, he became a party to the illegal imprisonment; (3) that a verdict and judgment for plaintiff should be sustained : McCarthy v. De Armit, 99 Pa. 64, distinguished.

Where there are two joint trespassers, the party injured may sue both or either, and if he proceeds against but one, that one cannot relieve himself from responsibility by showing that the other participated in the illegal act.

Argued Nov. 6, 1896.  Appeal, No. 160, Oct. T., 1896, by William E. Howley, defendant, from judgment of C. P. No. 2, Allegheny Co., July T., 1895, No. 37, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ.  Affirmed.

Trespass for malicious prosecution.  Before WHITE, J.

The facts appear by the opinion of the Supreme Court.

At the trial when John E. Kramer, the officer who arrested plaintiff, was on the stand, he testified as follows :

" A. I went there and made an examination of the house, and was led to believe it was opened from the inside.  That is from what Howley told me ; then I asked to see the girl and I had a talk with the girl, and she told me when she went up stairs that night she was positive that the side door was bolted. Q. That is the door leading up from the cellar ?  A. Yes, sir."

Objected to.

By the Court : Is the object of this to cast suspicion on her?

By Mr. Patterson of counsel for defendant : No, the object of this is to show that the officer here now on the witness stand

made the arrest, and that he made it because he had reasonable grounds to believe the report.

By the Court: He had no reasonable ground to make an wholly illegal arrest.

By Mr. Patterson : I offer this testimony for the purpose of showing that the arrest of the plaintiff was made by the witness upon the stand, and I offer to show the facts which were developed by his investigation at the house, together with the declaration of the plaintiff, for the purpose of showing he made that arrest because he had reasonable ground to believe that the plaintiff was guilty of either having committed or taken part in the committing of an offense.

Objected to.

By the Court: This is wholly incompetent. An officer may arrest a party on view without a warrant, but he never has any right to arrest a party on suspicion, unless there is an information and warrant. No officer has a right to arrest a party on suspicion, unless it is followed up by a prosecution and conviction, and where there is no prosecution afterwards, the arrest is wholly illegal. Officers arresting parties on suspicion, arrest them at their peril, and if the party arrested is innocent, they are liable for damages for the arrest.

Objection sustained. Exception. [9]

The court charged in part as follows :

[Now, gentlemen, there is no controversy here but what this arrest and imprisonment was wholly illegal. Police officers have no right to arrest any one on mere suspicion. They have a right, under the act of assembly, and the ordinance of the city, to arrest on view; that is, when they see a party committing a crime they can arrest him without a warrant, but they have no right to arrest any person without a warrant merely on suspicion. They cannot arrest on suspicion a suspicious character, without making inquiries of the person, because the ordinance and the act both say they can " arrest suspicious persons who cannot give a reasonable account of themselves." If they arrest a man merely on suspicion, he must be taken at once before a magistrate ; he is entitled to a hearing instantly without being locked up at all. He is to be taken before a magistrate, and if they have any evidence that would justify an information

then an information on oath ought to be made and a warrant issued, and on that warrant the party may then be put in prison. But they have no right to arrest a party on suspicion, to lock him up at once, and keep him there several days without a hearing, or without an information. I am aware, gentlemen, that police officers often do arrest suspicious persons, and very frequently it turns out that the party was guilty of some crime. Where this is an arrest without a warrant on suspicion merely, and it is followed up by a prosecution and conviction of the crime, that will excuse or justify the illegal arrest. But it is necessary to follow it up and get a conviction in order to justify an illegal arrest. I repeat that these officers, or any person making complaint to an officer, who becomes a party to the arrest, must see that the accused is taken at once before a magistrate without being locked up at all, and has a hearing, and if there is evidence that will justify an information, then information must be made and a warrant issued, and the party held on that warrant. Without that the whole proceeding is illegal.] [2] [Now, gentlemen, I have tried a good many cases of illegal arrest and illegal imprisonment, but I never knew of as gross a case as this. I said, during the trial, several times, when testimony was being offered that looked like a justification of this arrest, that there could be no justification of it, and, if there was any evidence offered for the purpose of justifying this arrest, it might be considered by the jury as an aggravation of damages. Some evidence that would justify the arrest possibly might be produced by way of mitigating damages, but, gentlemen, taking all the testimony we have in this case, there was nothing that would justify a warrant or an information against this girl for that burglary. There was nothing but the baldest kind of suspicion against her. Not a particle of evidence that would have justified Howley, or any other person, in making an information against her for this burglary, and nobody ever did make such an information.] [3]

Now the question is, who is responsible for the outrage committed upon this girl? According to her testimony, and that is undisputed, she is a colored girl of very good character. She has sustained a good and irreproachable character all her life, with not a breath of suspicion against her. Yet she is arrested without information or warrant, and locked up in a cell for eight

days and seven nights without a hearing. Kept among the roughs and miserable vagabonds that are kept in these station houses, and then let out without any attempt to atone for the outrage committed upon her. Who is responsible for it? Every person who was a party to it is responsible. There is, no doubt at all that Kramer, the officer that was taken to the house by Mr. Howley, might also have been prosecuted and have been made a party. But the question is, is Mr. Howley responsible; is Mr. Whitehouse responsible, both or either? [It is not necessary that Mr. Howley should have directed the constable to have arrested her. If he was there when the constable manifested his intention to arrest her and take her to the lockup, and he sanctioned it by his acquiescence without saying a word, he is responsible. She was his hired girl, living there in the house. It was his duty, if he knew that the constable was going to arrest her for burglarizing his house on facts he had given to the constable, it was his duty to speak out; it was his duty to say : " No, I know there is no information made against her." There has been no attempt to make an information against her, and if he stands by and sees his own hired girl arrested on a charge of burglarizing his house and stealing his silver plate, and he said nothing, but runs into another house as soon as the constable undertakes to take her away—if that is what he did, and for that purpose, it will not do for him to say he was not there when the constable arrested her. If he was there during the conversation with her, and told the constable facts which led the constable to believe that he suspected her of the burglary, and he knew that the constable intended to arrest her for that without a warrant, and he acquiesced in it in that way, sanctioning and consenting to it, he becomes a party to the illegal arrest.] [4]

[But, gentlemen, suppose that he knew nothing about the arrest; suppose he did not know anything about it at the time she was taken from the house. If he afterwards became a party to her illegal imprisonment he would be responsible. You recollect the testimony, and I may say that while the plaintiff says he was there at the time she was arrested and told to get her things, he denies it, and says he was not there at the time of the arrest and did not direct the constable to arrest her. You will take all the testimony and not merely one side. But

suppose he knew nothing about the arrest at the time the constable took her from the house, if he afterwards became a party to confining her or keeping her in the lockup, he becomes responsible for the illegal imprisonment. You have the testimony of Mrs. Briggs, a white lady, who brought this colored girl from Ohio, and with whom she lived a short time, and the next morning when the papers of the city announced the burglary and the arrest of this girl, Mr. Howley came to see her and inquired about her. Why did he go there if he had nothing to do with this arrest? He went there and inquired about this girl, and Mrs. Briggs says that she told him that the girl was a very respectable girl, and had never been guilty of anything; that she was honest. She says that he replied: "We will keep her there until she confesses." He denies that, but that is her testimony. Which will you believe? The colored man testified that he went there with Mr. Howley to try to extort a confession from this girl. She had told them on Monday morning when the constable accused her of it, that she had nothing to do with it and didn't know anything about it. If she was kept there in that cell for eight days and seven nights for the purpose of extorting something from her after her repeated denials, it was an aggravation of the most serious character in this case.] [5]

Mr. Whitehouse testified that he had charge of that station. He testified that he knew when she came there, and that he knew there was no information against her. If he, having charge of that station, kept the girl there for eight days, he becomes a party to her imprisonment; when he had the power to let her go, and kept her there for that length of time, he became a party to the illegal imprisonment of that girl.

These station houses have no right to receive persons there unless there is an information alleged against them and a warrant issued, or unless the officer says that he arrested the person on view. And, if arrested on view, the person is entitled to an immediate hearing, and not to be kept there seven days and nights. According to his testimony Mr. Whitehouse knew there was no warrant against her, and knew she was kept there without any legal authority whatever. Now, it may be, gentlemen, as I said, that very frequently rough characters, thieves, or persons prowling about, or that lower class of society may

be· arrested and put in these lockups over night, but even such persons are entitled to a hearing, and not to be kept in the lock-up without a hearing or without any information made against them.  [I do not suppose that Mr. Whitehouse was influenced by any unkind feeling towards this girl.  I have no doubt he thought that Mr. Howley was the party who had caused her to be brought there, and he thought that, simply as an officer in charge, there would be no particular responsibility on him, and I presume that if there is a verdict against these two parties, Mr. Howley is the one that will have to foot the verdict, although one would be legally responsible as much as the other.]  [6]

Now, gentlemen, if Mr. Howley and Mr. Whitehouse, or either of them, are legally responsible for this illegal imprisonment, what are the damages?  It is not only for the confinement during those days and nights, but the jury may take into account the circumstances, the place where she was confined, the surroundings, so far as they became a mortification of her feelings, and the mortification and annoyance to her, as well as if they will have any influence or effect on her future life.  [The damages would be, first, by way of compensation, and that rests largely in the discretion of the jury.  Compensation for the mortification, for the exposure before the public, for the injury to her character and reputation by being charged with an offense of that kind, and any expense that she may have been at in consequence of this.  Of course publishing the matter in the newspapers, and a matter as notorious as this was, the girl charged with being a party to the burglary of a house, unless she could be vindicated in some way, would be almost damning character for all time to come.  A·servant girl, who depends upon her labor for her support, if she is charged with a burglary of a serious character, or with being a party to a burglary, where could she get employment again; in what family could she get employment?  The injury to her reputation and character is an element to be considered by the jury in the way of compensation merely.  But in certain cases juries may go beyond compensation.  They may give a verdict by way of punishing the wrong-doers.  What are called punitive or vindictive damages, and where there has been a gross outrage upon the rights of an individual committed either in a malicious spirit or in an utterly reckless spirit, the jury may go beyond

compensation, and may give vindictive damages, what is called punitive damages.

Now, gentlemen, if you believe that Mr. Howley was a party to her being arrested and kept there in prison eight days and seven nights, without an information being made against her, and without her having an opportunity for a hearing, and he kept her there for the purpose of trying to extort from her a confession of her guilt, after her repeated declarations at first that she knew nothing about it, it would be a case for exemplary damages, something by way of punishing him for the wrong committed, as well as compensation for her.] [7]

Verdict for plaintiff against William E. Howley and Henry J. Whitehouse for $8,250, on which judgment was entered against Howley for $3,000, plaintiff remitting all above that amount, and new trial granted as to Whitehouse. Howley, defendant, appealed.

*Errors assigned* were (1) answer to defendant's point; the point and answer being quoted in the opinion of the Supreme Court; (2–7) above instructions, quoting them; (8) that the charge was unduly favorable to plaintiff; (9) ruling on evidence, quoting the bill of exceptions.

· *D. F. Patterson*, with him *E. J. Kent*, for appellant.—There was abundant evidence to warrant a finding that when appellant reported the burglary to the police authorit'es he left the entire control of the matter in their hands.

That the court below erred in the instruction given to the jury in the part of the charge embodied in the second assignment of error clearly appears from the ruling of this court in · the case of McCarthy v. De Armit, 99 Pa. 63.

There was good cause for more than mere bald suspicion of the appellee, and there was very reasonable grounds to suspect that she was implicated in the crime.

The parts of the charge embraced in the sixth and seventh assignments of error first impressed upon the jury that Howley was the responsible defendant who would "have to foot the verdict," and then encourages them to extreme liberality in fixing the damages.

*Frank Ammon,* with him *Samuel A. Ammon,* for appellee, cited Constitution of Penna., article 1, sec. 8; Wakely v. Hart, 6 Binn. 319.

OPINION BY MR. JUSTICE DEAN, January 4, 1897: .,

On the night of Sunday, November 11, 1894, the dwelling house of William E. Howley, defendant, was entered, and a quantity of silverware and other articles, to the value of $800 stolen. The plaintiff, Martha Burk, a colored woman thirty years of age, had been in the service of Howley for about one week, and on the night of the theft slept in the house. She was the sole occupant, and in charge of the house. Howley had just been married, and he and his wife were staying with his mother, who lived next door. The property taken had been kept in the dining room on the first floor of the Howley house. Martha, on rising in the morning about six o'clock, discovered the robbery, and at once gave the alarm to Howley, next door; he immediately on examination directed that nothing be disturbed until he brought an officer; he then left and soon returned with officer Kramer, who in presence of Howley charged Martha with the theft; she protested her innocence, but was arrested without warrant, taken to the patrol box a short distance off, and from there, in an open patrol wagon, to Oakland police station, placed in a cell, where she was kept eight days and nights, during which time she slept on a wooden bunk, without blankets, surrounded by such vagabonds and criminals in other and adjoining cells as the criminal population of a large city daily empties into a police station house. She alleged that by this rude treatment and exposure she was made ill and contracted rheumatism, which disabled her from service for that winter, besides subjecting her to expense for medical attendance. She had, so far as appears, always borne a good character, and had not before been charged with any crime or misdemeanor. The theft, and her arrest for it, formed the subject of sensational items for the newspapers the same and the next day. She then brought this action to recover damages for false imprisonment against Howley, officer Whitehouse, keeper of the station, and Roger O'Mara, chief of police. On the trial in the court below it was shown no information was ever made or warrant lodged against her; in the absence of regular proceedings by informa-

tion, either before or after her arrest, her detention for eight days was wholly illegal, and the court below so held.   There was no evidence connecting chief of police O'Mara with either the arrest or imprisonment, and as to him, the court properly directed a verdict for defendant.   As to Howley, the court, in effect, instructed the jury the arrest under the circumstances without warrant, and her detention in prison without lodging information against her, was illegal, and those guilty of it were answerable in damages; and further, that if Whitehouse, even though not concerned in the arrest, detained her in prison, with knowledge that she had not been arrested on view of the officer in commission of a felony, nor by warrant on information made, he also was answerable to her in damages for the long detention.   The jury rendered a verdict for plaintiff against both defendants for $8,250.   On motion for a new trial heard before the full bench, a new trial as to Whitehouse was granted; as to Howley an order was made that if plaintiff, as to him, released all of the verdict in excess of $3,000, the motion for a new trial be overruled, and judgment be entered on the verdict for that amount; otherwise that a new trial be granted to him also.   Plaintiff filed the release, and judgment was accordingly entered against Howley for the reduced amount, and we now have this appeal by him.

The appellant prefers nine assignments of error, all except the last alleging errors of law in the charge of the court.   The first complaint is to the refusal of the court to unqualifiedly affirm defendant's written point, as follows: " If the jury believe that the house of the defendant, W. E. Howley, was robbed, and he made known that fact to the police authorities of the city, and truthfully stated to said authorities the facts tending to cast suspicion upon the plaintiff as the thief, but that he made no information charging her with the offense, nor caused a warrant to be issued for her arrest, nor had any part in making or directing her arrest and imprisonment, the verdict of the jury should be in favor of the defendant, W. E. Howley."
*Answer:* " This point is too broad, and cannot therefore be affirmed.   It is not necessary to a conviction that Howley should have been an active party in making or directing the arrest and imprisonment of the plaintiff.   If the arrest was made at his instance, with his knowledge and consent, it is sufficient, al-

though he may not have directed the officer to arrest her.   But further, even if the arrest was without his knowledge and consent, yet, if he was a party to continuing her in the lock-up in the hope of getting a confession of some kind from her, he then became a party to the illegal imprisonment."

To a proper apprehension of the scope of this request, and the significance of the court's answer, the facts should be recalled.   The arrest presumably was illegal, the detention palpably so.   There was evidence on part of plaintiff that her arrest was brought about by statements of Howley to the officer.   Kramer, the officer who made the arrest, thus testifies: " Q. You can state whether he (Howley) said anything to you about suspecting her of having committed the robbery ?   A. He said somebody on the inside of the house must have opened it, and he said she was the only one on the inside of the house that he knew was there."   This witness was put on the stand by defendant, and thereby he impliedly asked the court and jury to credit his testimony, which shows that Howley directed suspicion against the girl, which suspicion had no other foundation than that some one inside the house must have opened it, and she was the only one inside.   He does not intimate to the officer the girl's previous good character which he had satisfied himself of when he employed her the week before, and which, if known to the officer, would have prompted him to caution. Whether these facts would have warranted an information of belief before a magistrate that she was guilty, or whether he would have issued thereon a warrant for her arrest, or whether on hearing these facts they would have justified her commitment or holding to bail, were not the questions to be determined.   The question was whether Howley, by words or acts had pointed her out to the officer brought to the house by him as the thief ? Howley called the officer to the stand to testify he had so pointed her out.   In view of this and other evidence to the same effect, the court refused to affirm the point, and explained why; it was too broad, in view of defendant's own evidence.   The court properly said in answer to it: " If the arrest was made at his instance, with his knowledge and consent, it is sufficient, although he may not have expressly directed the officer to arrest her."   But further it would have been manifest error to have affirmed the point, and to have directed a verdict for defendant,

because there was evidence to sustain another ground of recovery. The plaintiff had been illegally imprisoned for eight days. Mrs. Florence Briggs, a highly respectable woman, in whose service plaintiff had been for two or three years, and who had known her for ten years, testifies that Howley called on her the day after the arrest, and after Mrs. Briggs had told him of the plaintiff's established good character, and that the charge of dishonesty against her was incredible, he replied : "We had her locked up, and we will keep her locked up until she does confess . . . . I don't want to punish the girl, I just want to find my silverware. I won't punish her if she will just tell me who assisted her. I don't believe the girl herself did it, but she had an assistant. All I want is for her to admit the theft." There was evidence that frequent visits were made to the station by Howley and his brother, and plaintiff was importuned by them to confess her guilt, which she persistently denied, and that at last, by direction of Howley, she was released. No comment is needed on such conduct; that an humble citizen who has always borne a good character can on mere suspicion, at the instigation of a private person, be arrested, locked up and detained in a station house with its disagreeable surroundings for eight days, without information or warrant, and this with the knowledge of, if not with the connivance of two officers of the law, suggests its own comment. But there was ample evidence to show she was detained in prison by request of Howley, and that she was not released until he authorized it. His purpose was to extort a confession of guilt, a revival in a somewhat milder form of the rack and thumbscrew process to establish crime, and just as flagrantly unlawful. The court was bound to say in its qualified answer to the point, as it did say : "Even if the arrest was without (Howley's) knowledge and consent, yet if he was a party to continuing to keep her in the lock-up in the hope of getting a confession of some kind from her, he then became a party to the illegal imprisonment." The point, as framed might properly have been peremptorily denied.

The assignments of error from second to eighth inclusive are mainly to the charge of the court defining the authority to arrest for a felony on reasonable grounds of suspicion, without warrant. The court distinctly said that while an arrest, on an exigency where reasonable grounds of suspicion existed, might

be made, it was the duty of the person or officer making the arrest to take the accused before a magistrate for formal accusation and hearing, that the exigency which prompted the arrest on suspicion could not justify such a detention as this without hearing. In this there was no error. To sustain however the charge of error in this particular appellant cites and relies on McCarthy v. DeArmit, 99 Pa. 63. That case is undoubtedly the law, but the scope of the decision must, to a great extent, be defined by the facts there appearing. It was an arrest made by the direction of Mayor McCarthy of Pittsburg. In the aggravated riots of 1877, many persons, more than twenty, in efforts to suppress the riots and keep the peace had been murdered by the lawless. One man, called " Pat, the avenger," was seen to have shot two of the state troops, and was accused of killing more. Many arrests of rioters were made, but " Pat " could not be found; a reputable citizen informed an officer that the real name of the accused person was DeArmit, and strongly intimated he lived on 48th street; the mayor on investigation, directed his arrest late on Saturday night; on Monday morning he was taken before a judge on a writ of habeas corpus, but was held for a further hearing; on Monday afternoon, a respectable witness informed the mayor he had seen the man " Pat " when he shot the soldiers, and had also that day seen DeArmit, and DeArmit was not the same man. The mayor immediately informed the district attorney of this, and DeArmit was discharged by the judge before whom the writ was returnable. DeArmit brought suit for damages against the mayor. At the trial, among others, this point was put to the court and answered : " The testimony of defendant if believed does not disclose any ground of probable cause, and the verdict should be for plaintiff. *Answer :* this point is affirmed." This was generally the purport of the instructions. The verdict was for plaintiff in sum of $2,500, and defendant appealed to this court. The judgment was reversed, TRUNKEY, J. in delivering the opinion, after a citation of most of the authorities, saying : " Probable cause does not depend on the state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting. . . . What facts and circumstances amount to probable cause is a question of law. Whether they exist in any particular case is a question of fact. When the facts are in controversy the subject must be sub-

mitted to the jury, in which event it is the duty of the court to instruct them what facts will constitute probable cause, and submit to them only the question of such facts. This principle is well settled. If all the evidence is insufficient to establish probable cause the court shall so instruct the jury." Then after adverting to the facts at length this is the conclusion: "By law the Mayor is the chief conservator of the peace of Pittsburg. Upon the verity of the testimony adduced by the defendants, the mayor had probable cause to suspect that the plaintiff had committed the crime. The condition of the community during the time covered by the testimony, was material for him to consider, with the fact that citizens appeared in fear and evaded the inquiries of the detective officer. Probably they feared the mob or the murderer. . . . If the mayor had good reason to suspect, it was his duty to act to the end that the felon should not escape."

The charge before us in the assignments complained of, in substance, instructs the jury this arrest was without probable cause, or rather that there were no reasonable grounds of suspicion. Clearly, there are no facts in this case to which the principle announced in McCarthy v. DeArmit will apply. DeArmit in a time of turbulence, destruction of property and murder, was pointed out to the mayor as one who had deliberately shot two men; he was arrested at the direction of the chief executive of the city who was doing his utmost to quell the riots; the arrest was at midnight of Saturday, an hour when magistrates are not accessible; on the first juridical day thereafter, Monday, in the morning, he was brought before a judge and remanded; on the afternoon of the same day, he was discharged; his apprehension without warrant was not, under the circumstances, unreasonable, neither was his detention, and the court below was reversed for peremptorily instructing the jury that the arrest was illegal. But this colored girl was not charged with riot and murder in a time of great public alarm, and suspected of planning an escape. When Howley started and announced he was going for an officer she voluntarily remained in the house. He could almost as easily have procured a warrant and put it in the hands of an officer, then returned with him, as return with the officer and instigate her arrest without warrant. But why detain her in a cell for more

than a week? Obviously because there were no reasonable grounds of suspicion on which to base an information. His whole subsequent conduct shows that the imprisonment was prompted for the purpose of extorting an admission, without which there was no reasonable ground to suspect guilt. Clearly, if the exigency called for a sudden arrest without warrant, no such exigency existed for the eight days following, every hour of which was an illegal detention.

The ninth assignment is to ruling out part of the testimony of officer Kramer, a witness called by defendant. Kramer was not a party to the suit; if he had been, the evidence would have been admissible. The offer was to prove a private conversation he had with plaintiff immediately before her arrest as to the appearance of the rooms, but not in presence of Howley. What she said to Kramer, if Howley did not hear it, would not protect him, for Kramer testified positively that the arrest was made partly at Howley's suggestion, and not solely on his own responsibility. The only effect the testimony could have had, if admitted, would have been to show that Kramer ought to have been joined in the suit with Howley. Of two joint trespassers, the plaintiff could sue both or either; and if she proceeded against but one, that one could not relieve himself from responsibility by showing the other participated in the illegal act.

As the constitutional mandate that "The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures " is still in force, we think the judgment should be affirmed.

It is affirmed accordingly.