MATHIAS SIMMERMAN, PLAINTIFF IN ERROR, v. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. Criminal Law: CHANGE OF VENUE. An affidavit for a change of venue on the ground of the bias and prejudice of the people of a county should be made by one knowing the facts which he swears to. One made by a non-resident who shows no means of knowledge is not sufficient.

2. ———: ———. If a party is unable to obtain affidavits from residents of a county, he may state to whom he applied for the same, the reasons given by each for refusing, and that he was unable to procure affidavits in support of his motion because of the refusal of the citizens to give the same.

3. ———: FELONY: ARREST BY PRIVATE PERSON. Where a felony has been committed, and there is good cause to believe that a certain party committed the same, a private person may arrest such party until a warrant can be procured.

4. ———: VERDICT. Evidence examined and held to sustain the verdict of murder in the first degree.

5. ———: EVIDENCE: ARGUMENT OF DISTRICT ATTORNEY. Where the testimony showed that the plaintiff was a herder on the

plains, carried two revolvers and a knife, and made a display of them, and his companion carried four revolvers, *Held,* That it was not error for the district attorney to speak of him to the jury as " Billy the Kid or Jesse James sort of a cowboy," as the testimony warranted the language.

ERROR to the district court for Kearney county. Tried below before GASLIN, J.

*L. C. Burr,* for plaintiff in error.

*Isaac Powers, Jr., Attorney General,* for the State.

MAXWELL, J.

The case of *Simmerman v. The State* was before this court in 1883 (14 Neb., 568), the judgment of the court below being reversed and the cause remanded for a new trial. A second trial was then had, which resulted in the conviction of the plaintiff of murder in the first degree. The errors relied upon in the plaintiff's brief will be considered in their order.

*First.* That the court erred in overruling the motion for a change of venue. The motion was supported by four affidavits. That of A. F. Parsons stated in substance that he was an attorney at law residing at Lincoln, that he went to Kearney county prior to the term of court at which the defendant was tried the last time, and was unable to procure the affidavits of citizens of said county as to the bias or prejudice of the citizens; that they told him they would hang Simmerman if he was tried and acquitted, and that Simmerman would not leave Minden alive; that they had ropes in the court room with which to hang him. L. C. Burr also swears that he is an attorney at law residing at Lincoln, that he has been and is acquainted with the sentiment of the citizens of Kearney county; that the killing of Woods has caused a public discussion in the newspapers of the state in general circulation in said county; a

number of extracts from leading papers in the state condemning the murder and tending to incite violence, are copied in the affidavit. He also states that one Watkins, editor of one of the county papers of Kearney county, told him that he was employed by an Omaha paper to write a full account of the lynching of Simmerman by a mob, and that the article was then written, even to the date of the hanging. Simmerman also swears that during the former trial guards who had rifles and pistols in sight of the jury were in the court room, and that a rope was seen there. He also swears that he cannot have a fair and impartial trial in that county by reason of the prejudice of the citizens, his information being derived from the newspapers. Francis Hair also makes an affidavit to the same effect. On the part of the State an affidavit with twenty-four names of residents of the county was filed, stating that there had been a large increase of the population of the county by immigration since the murder was committed of men who knew nothing whatever about the case, and that there was no bias or prejudice against the plaintiff.

The constitution guarantees to every one accused of crime a fair trial before an impartial jury, and whenever it is made to appear satisfactorily from the evidence of leading citizens of the county that there is a bias and prejudice in that county against a party accused of crime so strong as to prevent a fair trial, it is the duty of the court to grant a change of venue. *Richmond v. The State, ante,* p. 388. Because if the excitement in a community is great, or the bias so strong as to prevent the jury from dispassionately weighing the evidence and rendering a verdict accordingly, the accused has been deprived of his constitutional rights, and may not have been found guilty upon the evidence alone. Courts should be very careful to see that a fair and impartial trial is had in every case. But a party seeking a change of venue must show by the best evidence that can be obtained the bias and prejudice against him. Thus, in

*Richmond v. The State, supra,* certain citizens of Platts-mouth made affidavits setting forth how long they had resided there, their several occupations and means of ac-quiring knowledge of public sentiment, and then stated from their own knowledge the facts in relation to the bias and prejudice of the public. The affiants swore to facts within their own knowledge. But in this case there is not a single affidavit in support of the motion filed by a citizen of Kearney county. It is true it is stated that the plaintiff was unable to procure such affidavits, but whether or not an effort was made to that effect is left entirely to conjec-ture. It is possible in some cases affidavits cannot be ob-tained in the county in support of such a motion, and where such is the case the party must state the facts—that is, what efforts he made to procure the same, to whom he applied, and the reasons given by the several persons whose affidavits were sought for refusing to give the same. Such evidence, while not very satisfactory, may be sufficient to establish bias and prejudice, and show that a fair trial can-not be had. But sweeping allegations of persons residing a great distance from the county, and whose knowledge is derived alone from a casual visit or from newspapers as to the state of public sentiment therein, is of very little value, and the same may be said of the extracts from newspapers. Most of the papers from which the extracts were taken are of general circulation in the state, and it is apparent that with the exception of the Minden paper, have no greater circulation in Kearney county in proportion to population than in the surrounding counties. It will not be contend-ed that because the newspapers have published an account of a murder and enlarged upon it somewhat, that therefore the person who committed the murder cannot be tried. If that was the law, then the more atrocious the crime, the greater the immunity from punishment. As to the arms in the court room, sworn to by the plaintiff as being seen on the former trial, the purpose does not appear, and there

Simmerman v. State.

is no presumption of wrong. Such arms should not be permitted in a court room during a trial, and we cannot believe the judge knew of their existence, and had his attention been called to the matter, undoubtedly he would have ordered them removed. In any event, it is not ground for reversal that on a former trial a few guns or other things were left in the court room during a portion or the whole of the trial. It is due to the judge before whom the case was tried to presume that if it had appeared to him that from any cause a fair and impartial trial could not be had in Kearney county that he would have ordered a change of the place of trial. It must affirmatively appear, therefore, that the court erred in overruling the motion, and as it does not, the point is not well taken.

*Second.* A few days previous to the killing of Woods, one Wray, a resident of Hitchcock county, lost about thirty-five head of horses out of the county. The brand on the horses he states was "a lazy L." The horses were missing from the county, and as they seem to have been running at large, he stated in substance that he had lost that many; that he telegraphed Jack Woods, the sheriff of Hitchcock county, who seems to have been at Kearney, "to look out for them as they were stolen." Two telegrams were sent from Hastings to Kearney and one from Culbertson to Kearney, and a portion of these dispatches at least were received and answered by Woods. One Nelson, a resident of Hitchcock county, testifies that "in the fore part of October a year ago" (1882), the plaintiff, with "three others who were about as rough looking fellows as he was, drove a bunch of horses into my pens on my ranch. I saw them when they were driving them in, and started down there, but by the time I got there they had them in and one of the horses caught." He also states that they had about thirty or thirty-five head, and that the only brand he recognized was "a lazy L." He also states that about

the 18th or 19th day of October, 1882, he met Wray returning from Minden with the same horses. Also Frank Eldridge, residing in Hitchcock county, testifies as follows: "I had been in the hotel there (at Culbertson), and had my dinner, and was sitting out on the porch in front of the hotel, and some persons came out and asked who was the sheriff of the county.

Q. Who asked that question?

A. Simmerman, this man here. He asked that question, and some one that stood there pointed to me, and I said "Jack Woods is sheriff of this county." Simmerman said, "He is an Englishman and a great foot racer." I said, yes. He said, I knew him in Texas. I know him like a book.

Q. Did you know Jack Woods personally?

A. Yes, sir; I knew him well.

Q. State what kind of a man Jack Woods was physically. Was he a foot racer?

A. Yes, sir, he could run well; there were very few that could outrun him."

There is also other testimony tending to show that the plaintiff was well acquainted with Woods, and that he was sheriff of Hitchcock county. On the 15th of October, 1882, the plaintiff with three others went to Minden, taking with them a portion of the horses belonging to Wray. The plaintiff was armed with two revolvers of 34 and ·38-caliber, and with a knife. Belmont, one of his companions, carried four revolvers. It is pretty evident, too, from the testimony that they made no secret of the number of weapons they carried, the plaintiff in particular having shown his to certain residents of the town. Belmont and the plaintiff took supper at the Commercial Hotel in Minden. One Minnie Dobson, who was in the dining room while they were at supper, testifies as to their conduct there as follows:

Q. State where you saw him (Simmerman).

A. I saw him in the Commercial Hotel in this town in the dining room.

Q. State whether the defendant here made any remarks there about being arrested.

A. He did at the supper table. They were at the table eating their supper. They were blackguarding and talking noisy, and my husband came in and attended to them. Then they talked between themselves not quite so loud. I was brushing off the other table and I heard some words that I thought were not right, and I listened to it. Simmerman said to Belmont, "You know what we are looking for and what we must do. You want to keep your eyes skinned, and the first damned son of a bitch that walks up to arrest you, shoot him like a dog. Don't let him get the drop on you."

Q. What arms did they have?

A. Each had a six shooter. They were lying on their laps. They sat facing each other so one could look into the kitchen, and the other into the dining room.

Also one Carson testifies that on the evening of the 15th of October, 1882, seeing a light in court house at Minden, the plaintiff "wanted to know who was under arrest for stealing horses. I said, Hair was." He said, "The first damned son of a bitch that tried to arrest him for horse stealing, he would kill him, or he would kill him." About six o'clock on the evening of the 16th of October, 1882, the plaintiff and Belmont went into the dining room of the Prairie Home, a hotel in Minden, and sat down at the table to eat supper, each one drawing a revolver and laying it on his lap. There is a conflict in the testimony as to their relative positions, the plaintiff and a number of witnesses stating that the plaintiff sat at the right of Belmont, while an equal number of witnesses testify that he sat at the left. While they were at supper, Jack Woods came in and stepped up to them, saying that they were to consider themselves under arrest. The testimony of the landlord,

who was waiting on the table and saw the entire affair, is very clear as to the relative situations of the parties, and what transpired is as follows:    " I was waiting at the table at the time; several were there eating supper.    Just as they were sitting eating, I saw these two men, Simmerman with another man, come in the door and they soon sat down to supper.

Q.    Did they have any arms on their persons?

A.    Yes, sir.    They had two revolvers or three, and a big knife.    They took a napkin and laid in their laps and laid their revolvers in their laps.    Then a man came in and shut the door after him, and walked in between them and told the man on the east to hold up his hands.    Then the fellow on the west grabbed Woods by the arm and threw him round so that he faced him, or to the west. Then the fellow on the east shot him in the back, and the fellow on the west said, ' Give him another one and shoot him dead.'.    Then another ball was fired and the lights went out."    On cross-examination, he testifies that the plaintiff sat to the left of Belmont, and that Woods placed his left hand on the plaintiff's shoulder, and put his right hand in between them and said, " Throw up your hands," and, " You are my prisoners."    This testimony is corroborated by a number of witnesses and by the wounds that caused the death of Woods, both of which were in the back.    The testimony showing that the plaintiff killed Woods, is clear and conclusive, and the jury were not only justified in finding that the plaintiff was guilty of the murder, but could not well have found otherwise.

But it said that even if he did kill Woods, that he did so while resisting an unlawful arrest, and therefore was justified, and that evidence that certain horses were stolen and in possession of the plaintiff and Belmont was improperly admitted.    The object of this evidence was to show that certain horses had been stolen, and that a portion of them at least were in the possession of the plaintiff.

In other words that the plaintiff was guilty of a felony. This, in connection with the evidence that the plaintiff on the previous. day had threatened to kill any one that attempted to arrest him, and that he was well acquainted with Woods, and knew that he was the sheriff of Hitchcock county, show that the plaintiff was expecting an attempt to arrest him, and also show an intention to kill whoever should make the attempt. The evidence therefore was properly admitted as showing a cause for attempting to make the arrest, as well as the threats to kill.

It is objected, however, that Woods had no warrant and was acting in a county where he had no official character, and therefore he was without authority.

Sec. 284 of the criminal code provides that any person not an officer may without warrant arrest any person if a petit larceny or felony has been committed and there has been reasonable ground to believe the person arrested guilty of such offense, and may detain him until a legal warrant can be obtained.

The testimony shows that Woods was the sheriff of Hitchcock county, that he had been informed by telegraph that the horses in possession of the plaintiff and Belmont had been stolen, and finding them in their possession certainly was sufficient to lead him to believe that they were the thieves. He therefore was justified in attempting to arrest them. In saying this we do not intend to modify the opinion in *Simmerman v. The State*, 14 Neb., 568. A person may resist an *unlawful* attempt at arrest, and, if necessary, rather than submit, may lawfully kill the person making it. That is, there must be a cause for making the arrest, a crime committed and reasonable ground to believe that the person sought to be arrested committed the offense. When these conditions exist, the law clothes any person with power to make the arrest until a warrant can be obtained. As these conditions existed in this case the attempt of Woods to arrest the plaintiff was not unlawful, and is no justification for the murder.

In addition to this, it is apparent that the plaintiff was expecting to meet Woods, as there is evidence tending to show that on the day preceding the murder, when some one mentioned the name of Wood, both Belmont and the plaintiff placed their hands on their revolvers. Some one then asked, what Wood? Just then lawyer Wood of the town came up and some one called him by name, when Belmont and the plaintiff went away, evidently showing that they supposed the person spoken of was the sheriff of that name.

*Third.* Misconduct of the district attorney in speaking of the plaintiff to the jury as "Billy the kid or Jesse James sort of a cow boy." The plaintiff in his testimony freely stated that he had been tending stock in New Mexico and on the plains; that he carried two revolvers and a butcher knife, and that his companion, Belmont, carried four revolvers. It is also apparent that the plaintiff displayed his weapons with something approaching braggadocio, and in fact, by his conduct, justified the district attorney in speaking of him in the way he did. Peaceable and law abiding men do not find it necessary in a peaceable community to load themselves down with deadly weapons, and their conduct is open to criticism when they do so. There was no error, therefore, in using the words complained of.

*Fourth.* Objections are made to the instructions, but it would subserve no good purpose to review them at length as we find no error in them. It is very clear from the evidence that the plaintiff intended to kill Wood or any one who attempted to arrest him, and that in pursuance of that intention the shots were fired by him, and that they were the cause of the death. Thus making deliberate and premeditated murder.

The plaintiff has had a fair trial, there is no doubt of his guilt and there is no material error in the record. The judgment is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.