### 10743

### FALLS v. PALMETTO POWER & LIGHT CO. *ET AL.*

(109 S. E. 93)

1. APPEAL AND ERROR—CHARGE NOT APPEALED FROM LAW OF CASE— A charge, not appealed from, is the law of the case.

2. FALSE IMPRISONMENT—ARREST HELD UNLAWFUL—Information given concerning plaintiff, as one who had committed a felony, and who was arrested on a warrant against John Doe, held not sufficient to warrant a man of ordinary reason to come to the conclusion that plaintiff was the man who committed the crime.

3. FALSE IMPRISONMENT—EVIDENCE HELD TO SHOW PARTICIPATION IN UNLAWFUL ARREST.—In an action for false imprisonment growing out of an arrest under information that plaintiff had sold property similar to that stolen, evidence held to show that the arrest was procured, instigated, and participated in by the general superintendent of the company from which the property was stolen.

4. CORPORATIONS—RESPONSIBILITY FOR UNLAWFUL ARREST HELD FOR JURY.—Whether a power and light company was responsible for wrongful arrest of plaintiff for an alleged breaking, entering and stealing of electric fans *held* for the jury, there being evidence that the person procuring the arrest was the general manager of all the company's business, and that the arrest was on account of its business.

5. FALSE IMPRISONMENT—WILLFULNESS WARRANTING PUNITIVE DAMAGES SHOWN.—In action against a power and light company, and its general superintendent, for unlawful arrest, evidence *held* such as to warrant a finding of willfulness or wantonness which would support punitive damages.

6. FALSE IMPRISONMENT—$2,000 NOT EXCESSIVE PUNITIVE DAMAGES.— A verdict for $2,000 punitive damages for willful unlawful arrest, causing plaintiff to miss a train, *held* not excessive or unreasonable

Before SEASE, J., Florence, November, 1920. Affirmed

Action by J. F. Falls against Palmetto Power & Light Co. Judgment for plaintiff and defendant appeals.

*Messrs. Willcox & Willcox, Henry E. Davis* and *James M. Lynch,* for appellant, cite: *Lawful arrest:* Crim. Code

1912, Sec. 1. *Must be made on dependable information*: 74 S. C. 412. *Test is what reasonable man would do under the same circumstances*: 19 Cyc. 352. *Must act promptly for public welfare*: 19 Cyc. 352. *Rule of liability of principal for act of agent in making arrest*: Ann. Cas. 1914-B, 638; L. R. 6 J. B. 65, 34 Am. Rep. 315; L. R. 5 C. P. 445; 34 Am. Rep. 311 (Md.); 39 N. Y. 381; 100 Am. Dec. 448; 15 Fed. 199; 26 A. L. R. 539 (N. Y.); 64 L. R. A. 685 (Pa.); 64 S. E. 18 (W. Va.); 8 L. R. A. 846 (Md.); 34 L. R. A. (N. S.) 525; 48 S. E. 816, 67 L. R. A. 455; 57 So. 563 (Miss.); 63 So. 904 (Fla.); 11 R. C. L. 811; 86 S. C. 73; 72 S. C. 205. *Agency cannot be proven by unsupported declarations of the agent*: 104 S. C. 30. *Judgment jointly binding on several parties if reversed as to one must be reversed as to all*: 172 U. S. 534.

*Messrs Royall & Fulton* and *Whiting & Baker.* for respondents, cite: *False imprisoment may arise from unlawful arrest, or from unlawful detention after a lawful arrest*: 2 Brev. 157; 1 R. C. L. 110; 101 S. E. 569. *Arresting officer must produce warrant on demand;* 95 S. E. 138. *Liability of principal for acts of agent*: 11 R. C. L. 810, par. 23; 6 Labatt Master & Servant, 7485, 7676; L. R. A. 1916-F, 1247; 6 A. L. R. 1469; 5 Fletcher Corpns., par 3345; 77 S. C. 546; 19 L. R. A. 824; 3 S. C. 1; 67 S. C. 391.

October 10, 1921.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

The case contains this statement:

"This was an action for damages, for an alleged false imprisonment of the respondent, arising out of the following facts: On the night of June 5, 1919, the storehouse of Palmetto Power & Light Company, a corporation engaged in the sale of electric current and of electrical appliances in Florence, was broken into and an electric fan

stolen therefrom. When discovered on the following morning the robbery was reported to the city police department. Upon investigation, it was discovered that upon the night of the robbery electric fans had been offered for sale in the city, to various persons, among others, to one J. W. Howard, proprietor of a restaurant, who described the person who had offered him the fan. It further developed that a fan had been purchased on that night by one Allowas, and upon examination the fan purchased by him was identified as that stolen from the electric company, and it was forthwith restored to that company by the police authorities."

"Thereafter, on the evening of June 8, 1919, Howard, seeing at the railroad station one whom he believed to have been the party who had offered to sell him two fans on the night of the robbery, telephoned the office of the company, and advised the general superintendent, the defendant Hodges, that the man who had tried to sell him a fan was at the depot, and if they would secure an officer they would get him. Thereupon Hodges had the police station telephoned, and upon being advised that the officer on duty then had no way of getting to the depot quickly, he offered the use of his personal automobile to carry him. Accordingly Hodges, the officer, and two others proceeded in Hodges' car to the depot. Upon arrival there, they were met by Howard, who advised them that the man had gone off but that his baggage was there indicating the same. Whereupon Hodges walked over and kicked the bag, and hearing a jingling sound, made some remark as to the bag containing tools. The officer went off in search of the party to be apprehended, and, upon his being pointed out by Howard, arrested the plaintiff, Falls."

"Falls, after some dispute, submitted to the arrest, and the officer started toward a taxicab. At this point Hodges again volunteered the use of his car. Falls, the

officer and the two who had accompanied Hodges to the depot got into the car with Hodges and drove off. They went through the streets of the city to the place where they were informed Allowas lived, but upon arrival there ascertained that he was not the man who had purchased the fan. They accordingly drove to another part of the city, where the right man was located. Upon Falls being presented to him, he failed to identify him as the party who had sold to him the stolen fan. Whereupon the officer released Falls and left the car. Falls and Hodges had some words over what had taken place, but Hodges drove him back to the station, and there left him."

"The plaintiff brought suit for $5,000 against Hodges personally and against Palmetto Power & Light Company. The case came on to be heard before his Honor, Judge Thomas S. Sease, and a jury at the November, 1920, term of the Court of Common Pleas for Florence County. At the conclusion of the testimony the defendants submitted a motion for a directed verdict, which was refused. The jury found for the plaintiff $500 actual, and $2,000 punitive damages. A motion for a new trial was made and refused. The defendant thereupon gave notice of an appeal to this Court."

The appellant's argument says:

"The exceptions present for determination these questions:

"(1) Was the arrest unlawful?

"(2) If unlawful, was it procured, instigated, or participated in by Hodges?

"(3) If unlawful and procured, instigated or participated in by Hodges, was the appellant Palmetto Power & Light Company responsible for his acts in connection therewith?

"(4) Was there any testimony tending to show willfulness or wantonness upon which the jury could base a verdict for punitive damages?

"(5) Was the verdict for punitive damages excessive and unreasonable?"

1. Was the arrest unlawful?

His Honor, Judge Sease, charged the jury as follows:

"Now what is a lawful arrest? I will first charge you that the breaking and entering of a house in the daytime or nighttime with intent to steal or commit some other felony is a felony, and any citizen may arrest a thief upon information, provided the information is sufficient to warrant a man of ordinary reason to come to the conclusion that the man sought to be arrested is the thief or felon. An officer or citizen may not arrest simply because a felony has been committed, but they may arrest the thief or felon, that is, the person who commits the felony or commits the theft, upon information that is reasonably calculated to satisfy a man of ordinary prudence and reason that the party sought to be arrested is guilty of a felony. I charge you that is applicable to an officer or a private citizen, and arrest may be made in these circumstances without a warrant."

This charge, not being appealed from, is the law of this case. There was evidence that some fans had been stolen from the defendants' corporation, but no evidence that the fans offered for sale to the defendants' witness Howard were stolen fans. Whatever may be said as to the sufficiency of the evidence of identification of the plaintiff by the witness Howard, yet as a matter of fact, the parties who made the arrest were not satisfied, and went off to find the purchaser of the fan. The warrant named the person to be arrested as "John Doe." That means that the person who made the affidavit and the officer who issued the warrant were uncertain as to the person to be arrested. The warrant itself bespoke caution. The plaintiff offered to prove his identity by citizens of Florence, easier of access than the purchaser of the fan, but his entreaties were ignored. His Honor charged the

jury that the arrest must be "upon information that is
reasonably calculated to satisfy a man of ordinary pru-
dence and reason that the party sought to be arrested is
guilty of a felony." The information did not even satisfy
the parties who made the arrest. Under the charge, there-
fore, the arrest was unlawful. This assignment of error
cannot be sustained.

If unlawful, was it procured, instigated or partici-
pated in by Hodges?

There was abundant evidence to show that the
arrest was procured, instigated, and participated in by
Hodges. The defendants' witness Howard stated:

"I had done what I promised to do, and that was all
the interest I took in it. I had promised Mr. Hodges to
telephone him. It was at his request and on account of
the company's business I was to phone down there."

Mr. Hodges directed the sending of the phone mes-
sage to police headquarters. He went in his own car for
the officer, took him to the place of arrest; watched the
plaintiff's baggage for plaintiff's return; took the prison-
er and officer to look for the purchaser of the stolen fan.
There was abundant evidence from which the jury might
have inferred that Mr. Hodges was the effective manager
of the entire proceedings. This assignment of error can-
not be sustained.

III. If unlawful and procured, instigated, and
participated in by Hodges, was the appellant
Palmetto Power & Light Company responsible for
his acts in connection therewith?

Here again the evidence was abundant. The evidence
showed that Mr. Hodges was the general manager of all
the company's business, and direct evidence, unobjected
to, and by defendants' witness, that it was "on account of
the company's business." It is true that Mr. Hodges
denied this, but that made it a question for the jury. This
assignment of error cannot be sustained.

IV.  Was there any testimony tending to show willfulness or wantonness upon which the jury could base a verdict for punitive damages?

The plaintiff was arrested while his identity was uncertain. He was not informed of the cause of his arrest. His request that he be allowed to show who he was by business people of Florence was ignored.  He was taken from a station where his train was about to depart, kept until it had gone; no apology for the injury done, and even though it suggested itself to Mr. Hodges that the plaintiff might be short of money, not only was there no offer of assistance, but it was made a matter of jest.

V. Was the verdict for punitive damages excessive and unreasonable?

The answer is No.

The judgment appealed from is affirmed.

Mr. Chief Justice Gary and Mr. Justice Watts concur.

Mr. Justice Cothran (dissenting) : The plaintiff recovered a verdict of $500 actual damages and $2,000 punitive damages against both of the defendants, the one a corporation and the other its general superintendent, on account of an alleged false imprisonment, which arose out of the facts, a statement of which from the agreed case is reproduced in the leading opinion.

It may not always be so, but in this particular case the charge of false imprisonment (more accurately denominated wrongful or unlawful imprisonment) depends primarily upon the lawfulness of the plaintiff's arrest, and that must be determined by the statute and the decisions construing it. There is a conflict of testimony as to whether or not the police officer who actually made the arrest had in his possession at the time of the arrest warrant which had been issued at the instance of the police department, charging the felony to have been committed by one "John

Doe." The plaintiff testified that he asked for it, and was told that the officer did not have one; one of his witnesses testified that Bryant, the police officer who made the arrest, had the warrant in his pocket. In this conflict I will consider the case as an arrest made without a warrant.

Under Section 1 of the Criminal Code an arrest may be made by an officer or by a private citizen, for a felony not committed in his view, "upon certain information that a felony had been committed." This statute was passed as this Court has very clearly shown in the case of *State v. Griffin,* 74 S. C. 412, 54 S. E. 603, to remedy a situation disclosed by the previous case of *State v. Anderson,* 1 Hill, 327. In the latter case the right to arrest without a warrant for a felony not committed in the view of the person (officer or private citizen) making the arrest was declared to be dependent upon the fact that a felony had been committed. The statute corrected the rigor of this interpretation, and conferred the right where the person making the arrest had "certain information that a felony had been committed." The Griffin Case holds that:

"The word 'certain' is used in the sense of trustworthy, capable of being depended upon, credible, positive, or reliable, and has reference to the evidence or information upon which the person making the arrest is allowed to act, and not to the actual fact that a felony has been committed;" that the statute must be "construed as enabling the party making the arrest to act upon information although it might not be true, provided it was of such a nature as to convince a reasonable man that the act had been committed from which the law presumed the felony by the person arrested."

It will be noted that the statute makes no reference to the information relating to the identity of the person arrested, with the criminal, upon which the officer or private citizen is authorized to act; but, in view of the purpose of the act as above explained and the improbability that

the exclusion of this matter was intended to permit the person making the arrest to act simply upon information that a crime had been committed, without reference to the connection of the person arrested with it, we must assume that the common law rule in reference to this excluded or omitted matter remained unaffected.    That principle is thus expressed in the Anderson case:

"In treason and felony within the jurisdiction of a State, the regular mode of arrest is by warrant, but from necessity as well as sound policy, private persons are permitted to arrest, where a felony has been committed and there are reasonable grounds to suspect the party arrested to be the felon."

This of course refers to officers as well as private citizens, in fact with greater reason, naturally.

In the determination of the question at issue, two apparently antipodal interests must be harmonized if possible, the liberty of a private citizen, and the interest of the public in punishing and preventing crime; and before extreme penalties may be visited upon one who has made a mistake the latter interest should be carefully guarded; as is declared by the Supreme Court of Louisiana in the case of *Lyons v. Carroll,* 107 La., 471; 31 South., 760:

"Those who honestly seek the enforcement of the law * * * and who are supported by circumstances sufficiently strong to warrant a cautious man in the belief that the party suspected may be guilty of the offense charged should not be made unduly apprehensive that they will be held answerable in damages."

That is the reason of the rule, also clearly expressed by Judge Pearson of the Supreme Court of North Carolina, in the case of *Brockway v. Crawford,* 48 N. C., 433; 67 Am. Dec., 250.   The plaintiff was arrested by the defendant, a constable. without a warrant, at the instigation of a brother of the man whose horse had been stolen, charged with larceny of the horse.   The constable acted upon a

description of the thief given to him by said brother, corroborated by another:

"The description of the clothes and the personal appearance resembled Clarey (the thief) very closely."

The plaintiff had a verdict which was reversed on appeal, the Court holding:

"The law encourages every one, as well private citizens as officers, to keep a sharp lookout for the apprehension of felons, by holding them exempt from responsibility for an arrest or prosecution, although the party charged turns out not to be guilty, unless the arrest is made or the prosecution is instituted without probable cause and from malice."

The opinion further states:

"What has the plaintiff (if he be a good citizen) to complain of? A felony is committed, and the felon escapes; he is advertised, and a reward of $100 is offered for his apprehension. The plaintiff bears a close resemblance both in dress and personal appearance to the suspected person; his association and fixedness in his position as a member of the community do not place him above the marks of honest suspicion which attach to him because of the close resemblance to the man who figures under the reward of $100 as a fugitive from justice. Has he cause to complain? Ought he not rather to congratulate himself that he lives in a land where justice is administered with a steady hand? And if occasionally 'the wrong passenger is waked up,' every good citizen should bear in mind that it was meant for the best, and will work around for the good of the whole."

"Probable cause for an arrest has been defined to be a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty." 2 R. C. L., 451, citing *People v. Klivington,* 104 Cal., 86; 37 Pac., 799; 43

Am. St. Rep., 73; *Diers v. Mallon,* 46 Neb., 121; 64 N. W., 722; 50 Am. St. Rep., 598; *Burk v. Howley,* 179 Pa., 539; 36 Atl., 327; 57 Am. St. Rep., 607.

"Yet probable cause does not depend on the actual state of the case in point of fact, as it may turn out upon legal investigation, but on knowledge of facts and circumstances, which would be sufficient to induce a reasonable belief of the truth of the accusation." *2 R. C. L.,* 451.

"But since in such a case (arrest without warrant) the person to be arrested is not specifically indicated by a written warrant, and the officer must necessarily act on his own reasonable judgment, and often in haste to prevent the escape of the criminal, he is protected if he acts in good faith and on reasonable grounds of suspicion, though the person proves not to have been the felon, or no felony was in fact committed." 11 R. C. L., 801.

In *Pinkerton v. Martin,* 82 Ill. App., 589, it was held that detention by the officer in a county where the offence was not committed for a justifiable time for purposes of identification is not false imprisonment.

"A peace officer may also arrest without a warrant one whom he has reasonable or probable grounds to suspect of having committed a felony, even though the person suspected is innocent, and generally though no felony has in fact been committed by any one." 3 Cyc., 878.

"The reasonable and probable grounds that will justify an officer in arresting without a warrant one whom he suspects of felony must be such as would actuate a reasonable man, acting in good faith." 3 Cyc., 887.

In *Eanes v. State,* 6 Humph., (Tenn.), 53; 44 Am. Dec., 289, the defendant was a peace officer, and was indicted for assault and battery for the arrest without warrant of one Martin. A murder had been committed and the murderer had escaped; the defendant, a constable in another county, acting upon the Governor's proclamation, which contained a description of the fugitive. The coroner of the

county had also written a letter containing a description of the person. The defendant, acting upon both, arrested Martin for the fugitive. He was convicted, but on appeal the judgment was reversed, the Court holding:

"The liberty of the citizen is so highly regarded that the officer arresting a supposed felon, without warrant, must act in good faith, and upon grounds of probable suspicion that the person to be arrested is the actual felon. If he may not, under such circumstances, make an arrest, the escape of criminals would be but little obstructed by the official proclamation of the Governor, and the police of the State, instead of being, as public policy urgently requires, vigilant and effective, would be altogether the contrary."

In *Reuck v. McGregor,* 32 N. J. Law, 70, the plaintiff came into the defendant's store with a piece of cloth for sale. The defendant pronounced it a piece that had been stolen from his store. Angry words followed, and the defendant called a policeman, who put the plaintiff under arrest. It was not in fact the defendant's cloth, though similar to a piece he had had misplaced or stolen. The plaintiff had a verdict of $3,000. Upon this appeal the Court said:

"We cannot fail to pronounce this a very striking instance of mistaken identity, without any evil design against the plaintiff, and founded upon such reasonable grounds of belief as would be sufficient, at least, to relieve the defendant from any charge of malicious prosecution, had he made complaint to the magistrate before the arrest, and quite sufficient to authorize the defendant to arrest the plaintiff, without warrant, if the proof that a felony had been committed had been complete. The proof is not clear that a larceny of McGregor's cloth had been committed, yet he never found it, and there is nothing in the case to induce us to think that he feigned it, or that he did not believe it, but, on the contrary, the circumstances would reasonably create the belief in the mind of McGregor that his cloth had been stolen."

And they held that, considering these circumstances, the verdict was excessive, and granted a new trial.

In *Samuel v. Payne,* Doug. Rep., 359, Lord Mansfield laid down the law that if a felony had been committed any man, upon reasonable, probable ground of suspicion, may justify apprehending the suspected person.

In *Holley v. Mix,* 3 Wend. (N. Y.), 350; 20 Am. Dec., 702, it is said:

"If an innocent person is arrested upon suspicion by a private individual, such individual is excused if a felony was in fact committed and there was a reasonable ground to suspect the person arrested."

In a note to 55 Am. Dec., 104, Judge Freeman says, citing Bail Cr. L., 543:

"Probable suspicion of who the offending party is will justify the arrest by an officer; and probable suspicion will be a justification when it transpires that no felony had in fact been committed, provided that the officer had reasonable grounds to suspect the arrested party."

In *Carr v. State,* 43 Ark., 99, it is held:

"Where a felony has in fact been committed, either an officer or a private citizen, who has reasonable ground to suspect a particular person, may, if acting in good faith, arrest such person without a warrant."

A peace officer may arrest without a warrant if he has reasonable ground to suspect that defendant is guilty of a felony. *Johnson v. State,* 30 Ga., 426; *Harris v. Bennet,* 1 Phila. (Pa.), 175; *Lewis v. State,* 3 Head, (Tenn.), 127.

"An officer may arrest without a warrant a person accused of a felony, where there are circumstances showing a probability that the accused committed the crime, and it is necessary to make the arrest in order to prevent him from escaping." *Dodds v. Board,* 43 Ill., 95.

"A public officer, if he knows a felony has been committed in his jurisdiction, and has good reason to suspect a particular person as the guilty party, should, without a warrant, arrest such a person." *Marsh v. Smith*, 49 Ill., 396.

"A peace officer, having reasonable grounds to suspect one of crime, * * * may without warrant arrest the supposed offender." *Rohan v. Sawin*, 5 Cush., (Mass.), 281.

"A peace officer may arrest without a warrant, on information that a felony has been committed, when he has reasonable or probable cause to believe that it has been committed." *Doering v. State*, 49 Ind., 56; 19 Am. Rep., 669; *Warner v. Grace*, 14 Minn., 487, (Gil. 364); *Barnes v. Erben*, 40 N. Y., 463; *Fulton v. Staats*, 41 N. Y., 498; *Neal v. Joyner*, 89 N. C., 287; *Russell v. Shuster*, 8 Watts & S., (Pa.), 308; *Chandler v. Rutherford*, 101 Fed., 774; 43 C. C. A., 218; *Kirk v. Garrett*, 84 Md., 383; 35 Atl., 1089; *Brish v. Carter*, 98 Md., 445; 57 Atl., 210; *Gale v. Hoyt*, 5 Dane, Abr., (Mass.), 588; *State v. Hancock*, 73 Mo. App., 19; *Rarick v. McManomon*, 17 Pa. Sup. Ct., 154; *State v. Taylor*, 70 Vt. 1; 39 Atl., 447; 42 L. R. A., 673; 67 Am. St. Rep., 648; *Pritchett v. Sullivan*, 182 Fed., 480; 104 C. C. A., 624; *Commonwealth v. Phelps*, 209 Mass., 396; 95 N. E., 868; Ann. Cas., 1912B, 566; *Keefe v. Hart*, 213 Mass., 476; 100 N. E., 558; Ann. Cas., 1914A, 716; *State v. Whitley*, (Mo.), 183 S. W., 317.

The same rule applies to a private citizen. *Wright v Commonwealth*, 85 Ky., 123; 2 S. W., 904; *Long v. State*, 12 Ga., 293; *Simmerman v. State*, 16 Neb., 615; 21 N. W., 387; *Brooks v. Commonwealth*, 61 Pa., 352; 100 Atl., 645; *U. S. v. Boyd*, (C. C.), 45 Fed., 851; *Reuck v. McGregor*, 32 N. J. Law, 70; *Burns v. Erben*, 40 N. Y., 463; *Hawley v. Butler*, 54 Barb., (N. Y.), 490; *Neal v. Joyner*, 89 N. C., 287; *Davis v. U. S.*, 16 App. D. C., 442; *Maliniemi v. Gronlund*, 92 Mich., 222; 52 N. W., 627; 31 Am. St. Rep., 576; *Suell v. Derricott*, 161 Ala., 259; 49 South., 895; 23 L. R. A., (N. S.), 996; 18 Ann. Cas., 636; *State v. Jones*, 91 Ark., 5; 120 S. W., 154; 18 Ann. Cas., 293.

This being the unquestioned law of the case, the inquiry naturally follows, Does the testimony show that the police officer who made the arrest, and Hodges, who I will assume instigated the arrest, come within the rule?

The testimony does not disclose a single circumstance to my mind tending to show that they, or either of them, had any other purpose or motive than to do what is the duty of every good citizen, to run down the perpetrator of a crime, or that they were not acting in good faith upon a reasonable suspicion that Falls was the guilty party.    He was a stranger in Florence; neither of these men knew him, and therefore could not have entertained any personal animosity towards him; they were both, the one an officer of the law and the other an employee of the power company, deeply concerned in apprehending the criminal; and if either showed a disposition to wantonly harass the plaintiff or to do otherwise than they should be expected to have done under the circumstances, I have failed to read the testimony aright.

A felony had been committed; a store had been burglarized and property stolen; a part of the stolen property had been recovered from a man to whom the thief had sold it; property of the same kind had been offered to another for sale at suspicious prices on the night of the robbery; the latter described the man who offered the property to him by clothing and appearance, and promised to report it if he saw him again.    Two days afterwards Howard, the cafe man, to whom the property was offered for sale, was at the Florence depot and saw a man whom he believed to be the party who had proposed the sale.    He phoned the information to the superintendent of the power company. The police department was notified, and the superintendent went around to headquarters in his car and carried the policeman to the station for the purpose of making the arrest.    The plaintiff was a stranger in Florence, and was

about to leave on the train.   He had with him, innocently as it developed, a bag of tools.   He was identified by Howard as the man who had offered to sell him fans.   Thereupon he was arrested.

The validity of the arrest must be determined, not by what followed, but by the circumstances as they existed at the time of the arrest. It may or may not have been proper for the police officer and Hodges to convey the plaintiff to the Greek for identification, as the seller of the fan, which was recovered and turned bark to the company, or to refuse his request that he be vouched for at O'Dowd's Theatre, where he had been at work, or to decline to pay his hotel bill, or to treat him with discourteous jest when they had carried him back to the depot, but those circumstances could not invalidate an arrest previously made if valid at the time it was made.   They could only be considered upon the question of punitive damages in the event that the arrest was unlawful.

I think that under the law the police department and Hodges were entirely justified, in the circumstances, to make the arrest, and that the police would have been subjected to just criticism if they had not acted upon the information which they received, coming as it did from an entirely disinterested source and exceedingly reasonable in its nature.   It is unfortunate and greatly to be regretted that they subjected an innocent man to the humiliation of an unjust accusation, but as their good faith in the matter cannot be reasonably questioned, in my opinion, the plaintiff's discomfiture should be borne with equanimity and with the assurance that it is far better that individual hardships may go unrequited than that the vigor of the enforcement of the law be paralyzed by the fear of damage suits.

In my opinion it will be a serious blow to the efficient discovery of crime and arrest of the criminal to sustain the judgment in this case.   It may easily be conceived that the very same circumstances that existed in this case would

point to the real burglar; and yet a majority conclusion will stay the arm of the law and allow him with his kit of tools and positive identification "to fold his tent like the Arab and silently steal away."

It must be remembered that at the time Howard phoned to the company's office the warrant had been issued at the instance, not of Hodges, but of the police department, and upon information furnished, not by Hodges, but by Howard and the Greek. Both gave the same description, and the police had looked all over town for a man answering that description. The chief testified:

"I had not spoken to the Palmetto Power & Light Company, or Hodges, concerning the warrant." It is very clear that if Howard had phoned to the police instead of to the office of the company, the police would have done precisely what they did and should have done. The chief says:

"If I had found as chief of police any one answering the description contained on that warrant I would have arrested him. If I had been informed by Mr. Howard or Allowas that a certain man was the man that sold him a fan, I would have arrested him."

It is plain therefore that the police acted, not upon Hodges' insistence, but upon the information received from Howard, which had been relayed from the office.

The law requires that immediately upon arrest the party shall be taken before a magistrate to be dealt with according to law. Strictly speaking, the officer was not warranted in taking the plaintiff to the Greek's shop for identification, but, interpreting the motive by the conduct of the officer after the identification had failed, the prompt release of the plaintiff, it is clear that this was done for the benefit of the plaintiff, that he might be discharged without being committed to jail should the identification fail. I do not see that this was a matter of which he could complain, when it resulted so quickly to his advantage. Serious complaint is made upon the ground that the plaintiff was not

allowed to stop at O'Dowd's Theatre and obtain from him a certificate of his good character. O'Dowd does not appear to have had any acquaintance with the plaintiff until he came to Florence to do certain work upon an organ, on Friday before the arrest on Sunday. Certainly an interview with O'Dowd could not have been as effective as that with the Greek proved to be. If O'Dowd could have established the innocence of the plaintiff, which is more than doubtful, he certainly could not have accomplished more than the Greek did. The gist of his complaint is that he was not carried to one whose ability to exculpate him was questionable, but to one whose testimony completely exonerated him and caused his immediate release. As the chief of police testified, the Greek was the proper man to identify him and not O'Dowd. If the plaintiff had been carried to O'Dowd and had been vouched for by him and discharged, I have no idea that it would have prevented this suit for damages.

"A legal arrest is not tainted by a subsequent illegal detention so as to make the arresting officer a trespasser ab initio unless the arrest was intended as a cover to subsequent illegal conduct." 19 Cyc., 355, citing *Friesenhan v. Maines,* 137 Mich., 10; 100 N. W., 172.

Complaint is also made that no consideration was paid to the plaintiff after he was returned to the station. It appears that Falls was naturally and justifiably indignant on account of the unfounded charge preferred against him, and doubtless gave vent to his indignation in forcible language, which he had the right to do. But, choosing to exercise this right, he cannot complain that certain courtesies were not extended to him which, humanly speaking, were made impossible by his own extreme language.

Assuming, however, for argument's sake that the arrest was unlawful, and that it was instigated and participated in by Hodges, the superintendent of the power company, I think that the authorities are absolutely conclusive of the

immunity of the corporation for such acts by its superintendent. They clearly establish this proposition:

One who is charged with custody and control of property of another is authorized to do any and all things necessary to protect and preserve the property. If it were necessary to arrest one to prevent a theft of the property, he would be authorized to cause such an arrest, not to punish the offender, but to prevent the theft. After a theft is committed, however, he would have no authority to put the criminal law in operation, because the object then sought and the result thereby attained, would not be the protection or preservation of the property, but the punishment of the criminal and the vindication of justice.

The leading case upon the subject seems to be the English case of *Allen v. London and S. W. Ry.,* L. R. 6 Q. B., 65. In that case a clerk in the service of the corporation was charged with the duty of selling tickets to passengers, and receiving the money therefor, which he deposited in a till. The clerk arrested and gave into custody one whom he suspected of attempting to rob the till. Lord Blackburn delivered an opinion in which he makes the following statement of the law:

"There is marked distinction between an act done for the purpose of protecting the property by preventing a felony or of receiving it back and an act done for the purpose of punishing the offender for that which has already been done. There is no implied authority in a person having the custody of property to take such steps as he thinks fit to punish a person who he supposes has done something with reference to the property which he has not done. The act of punishing the offender is not anything done with reference to the property; it is done merely for the purpose of vindicating justice."

The Supreme Court of Maryland, after quoting Lord Blackburn, held:

"From these authorities it is quite clear that in a case like the present, where the corporation is sought to be held liable for the wrongful and malicious act of its agent or servant in putting the criminal law in operation against a party upon a charge of having fraudulently embezzled the money and goods of the company, in order to sustain the right to recover, it should be made to appear that the agent was expressly authorized to act as he did by the corporation. The doing of such an act could not, in the nature of things, be in the exercise of the ordinary duties of the agent or servant intrusted with the custody of the company's money or goods; and, before the corporation can be made liable for such an act, it must be shown, either that there was express precedent authority for doing the act, or that the act has been ratified and adopted by the corporation." *Carter v. Howe Mach. Co.,* 51 Md., 290; 34 Am. Rep., 311.

In *Mali v. Lord,* 39 N. Y., 381; 100 Am. Dec., 448, the superintendent of defendant's store caused the arrest and search of a female customer, whom he suspected of having stolen goods. The New York Court thus stated the rule in holding the master not liable:

"In examining this question it must be assumed that, by the employment, the master confers upon the servant the right to do all necessary and proper acts for the protection and preservation of his property, to protect it against any thieves and marauders, and that the servant owes the duty so to protect it to his employer. But this does not include the power in question. It cannot be presumed that a master, by intrusting his servant with his property, and conferring power upon him to transact its business, thereby authorizes him to do any act for its protection that he could not lawfully do himself if present. The master would not, if present, be justified in arresting, detaining, and searching a person upon suspicion, however strong, of having stolen his goods, and secreted them upon his person.

"The authority of the defendants to the superintendent could not therefore be implied from his employment. The act was not done in the business of the defendants, and they were not, as masters, responsible therefor."

The Federal Circuit Court in *Pressley v. Mobile & G. R. Co.,* (C. C.), 15 Fed., 199, reaches the same conclusion. There a person employed as a land agent by defendant company, and as such having custody of certain property, caused the arrest of plaintiff upon a charge of grand larceny committed in reference to such property. The Court said:

"The question is, Can such action on his part be held to be within the scope of his agency and in the course of his employment? There may be, and the books recognize some difficulty in determining what acts of an agent or employee are properly within the range and course of his employment; but to say that to put the criminal law in operation against a party on a charge of larceny of the property of the corporation is within the scope of his agency, and in the course of his employment, is a proposition which, in the light of the decided cases, cannot be maintained."

It is held in the following cases that where the servant acts outside of the duties of his employment, and without express directions, his act ceases to be that of the master; the servant, and not the master, is liable for the consequences. *Courtney v. Baker,* 37 N. Y. Super. Ct., 225; *Isaacs v. Railroad Co.,* 47 N. Y., 127; 7 Am. Rep., 418; *Cosgrove v. Ogden,* 49 N. Y., 258; 10 Am. Rep., 361; *Mott v. Ice Co.,* 73 N. Y., 548; *Garretzen v. Duenckel,* 50 Mo., 109; 11 Am. Rep., 405; *Carter v. Mach. Co.,* 51 Md. 297; 34 Am. Rep., 311.

"The rule is well settled that the liability of a principal for the act of his agent in instituting a malicious prosecution or causing a false arrest or imprisonment is dependent on whether the principal previously authorized the act,

or subsequently ratified it, or whether the act was within the scope of the agent's employment. If previously authorized or subsequently ratified, or if within the scope of the agent's employment, the principal is liable; otherwise he is not." Note, *Fisher v. Westmoreland,* Ann. Cas., 1914B, 638.

See, also, *Mulligan v. N. Y. & R. B. Ry.,* 129 N. Y. 506; 29 N. E., 952; 14 L. R. A., 791; 26 Am. St. Rep.. 539, *Markley v. Snow,* 207 Pa., 447; 56 Atl., 999; 64 L. R. A., 685. *McKain v. Baltimore, etc., Ry.,* 65 W. Va.,. 233; 64 S. E., 18; 23 L. R. A. (N. S.), 289; 131 Am. St. Rep., 964; 17 Ann. Cas., 634. *Tolchester Beach Imp. Co. v. Steinmeier,* 72 Md., 313; 20 Atl., 188; 8 L. R. A., 846. *Mayfield v. St. Louis, etc., Ry. Co.,* 97 Ark., 24; 133 S. W., 168; 32 L. R. A., (N. S.), 525.

The case of *Daniel v. A. C .L.,* 136 N. C., 517; 48 S. E., 816; 67 L. R. A., 455; 1 Ann. Cas., 718, contains an exceedingly able presentation of the question; the Court arriving at the foregoing conclusion.

The case of *Simmons v. Okeetee Club,* 86 S. C., 73; 68 S. E., 131, is instructive. In this case Thomas was the agent and servant of the Okeetee Club and as such charged with the care and protection of its property. Simmons, the plaintiff, an adjoining landowner, claimed that Okeetee Club had erected a fence on lands belonging to him, and he proceeded to tear down the fence. Thereafter it was replaced, and plaintiff was warned by the agent Thomas that if the fence was torn down again, he (Thomas) would shoot the plaintiff. The plaintiff did tear down the fence, and Thomas proceeded to carry his threat into exectuion. Simmons sued Thomas and the club, alleging that Thomas was in the discharge of his duty to Okeetee Club, and acting within the scope thereof," in shooting him. Upon these facts, this Court, speaking through Mr. Justice (now Chief Justice) Gary, held:

"We proceed to consider whether there was any testimony tending to show that the shooting of the plaintiff by Thomas was within the apparent scope of his authority to protect the fence. The undisputed testimony showed that at the time of the shooting the fence had been cut by the plaintiff, who had resumed work on the rairoad about 1,600 feet from the place where the fence had stood; and of course he was not then attempting to injure the fence. The act of destroying the fence was then completely executed. If the testimony had shown that the shooting took place while the work of construction was in *fieri*, the nonsuit would have been improper. But we fail to see what relation the shooting had to the protection of the property, as it could not be successfully contended that it would prevent the plaintiff, in future, from cutting the fence. Under such circumstances the Court cannot hold that there was testimony tending to show that the shooting was within the implied authority of the agent."

In *Davenport v. Railroad Co.,* 72 S. C., 205; 51 S. E., 677; 110 Am. St. Rep., 598, the servants of the railway company, while engaged in operating a freight train, threw bricks at plaintiff's dwelling house.      And in distinguishing the case from *Pollaty v. Railway Co.,* 67 S. C., 391; 45 S. E., 932; 100 Am. St. Rep., 750, Mr. Justice Jones very clearly shows that in *Pollatty v. Railway Co.* the engineer was engaged in protecting the property of his principal from a trespasser, and hence within the scope of his agency, whereas, in *Davenport v. Railway,* the servants were not so engaged, and under the facts their actions were not within the scope of their agency, and the master was not liable therefor.

This, then, is the situation. Hodges is the general superintendent in charge of the plant and property of the company at Florence. As such he has the authority to protect and preserve that property. A fan is stolen. Subsequently it is recovered. A day or two later one suspected of the

theft is arrested, upon the alleged instigation of Hodges. Even if procured by him, the company is not responsible for his act in causing the arrest. Its property has been recovered. His act in causing the arrest is not to preserve or protect its property, but to apprehend and punish the criminal. The company has no interest therein, aside from the general public interest. Hodges' act is not authorized or ratified by the company. Under the overwhelming weight of authority it is not within the apparent scope of his agency. He acted in the public interest, for the vindication of justice, not the protection of his principal. There can be but one conclusion consonant with established precedent: the company is not liable.

In the case of *Fields v. Lancaster Mills,* 77 S. C., 546; 58 S. E., 608; 11 L. R. A., (N. S.), 822; 122 Am. St. Rep., 593; the plaintiff was thrown into a pond by the overseers of the mill in the presence of the superintendent. It was an issue in the case whether the superintendent participated in the wrong. The plaintiff was a labor scout, and his presence on the mill property was not desired. The question of the mill's responsibility for the act of the superintendent was decided upon this point:

"The evidence on the part of the defendant shows the superintendent, in this instance, was intrusted with the control of its policy and the methods to be employed to prevent interference with the operatives"

—a matter placed under his control by the mill, and the Court very properly held that it was within the scope of his employment.

The case of *Stevenson v. Baldwin Mills,* 114 S. C., 367; 103 S. E., 710, was one of arrest under a void warrant. The Court says:

"The evidence is conclusive that the warrant was gotten out by the authorities of the mill, to collect the debt."

Of course under these circumstances there could be no question but that the mill was liable.

In *Hypes v. Railway Co.,* 82 S. C., 315; 64 S. E., 395; 21 L. R. A. (N. S.), 873; 17 Ann. Cas., 620, the action was against the corporation for a slander by its superintendent. The case was upon demurrer to the complaint, which alleged that the slander was uttered "within the scope of his authority and in the discharge of his duties as superintendent," which of course brought it within the rule.

In *Daniel v. A. C. L.,* 136 N. C., 517; 48 S. E., 816; 67 L. R. A., 455; 1 Ann. Cas., 718, this exceedingly clear and logical statement occurs:

"A servant intrusted with his master's goods may do what is necessary to preserve and protect them, because his authority to do so is clearly implied by the nature of the service; but when the property has been taken from his custody or stolen, and the crime has already been committed, it cannot be said that a criminal prosecution is necessary for its preservation or protection. This may lead to the punishment of the thief or the trespasser, but it certainly will not restore the property, or tend in any degree to preserve or protect it. It is an act clearly without the scope of the agency, and cannot possibly be brought within the limits of the implied authority of the agent. It would seem that so plain a proposition should need neither argument nor authority to support it, but we are abundantly supplied with both in the cases upon the subject."

In *Washington Co. v. Lansden,* 172 U. S., 534; 19 Sup. Ct., 296; 43 L. Ed. 543, the rule is thus stated:

"The result of the authorities is, as we think, that in order to hold a corporation liable for the torts of any of its agents, the act in question must be performed in the course and within the scope of the agent's employment in the business of the principal."

In that case it was sought to hold the corporation liable for a libel published by the general manager of the company relating to certain testimony the plaintiff had given before a congressional committee. The Court said further:

"There must be evidence of some facts from which the authority of the agent to act upon or in relation to the subject-matter involved may be fairly and legitimately inferred by the Court or jury," and that, if only one inference can be drawn from the evidence, the question is one of law for the Court.

They held although Leetch was the general manager and was writing about a matter connected with the business of the company, there was no evidence from which it could be legitimately inferred that his authority extended to the matter in hand.

I think that it is perfectly clear that Hodges is not liable, for the reason that he acted as a man of ordinary care would have acted and as a correct conception of a public duty dictated; that the power company is not liable, for the reasons just stated; but, if Hodges should be liable and the power company not, the judgment should be reversed as to him, for the reason that the burden of paying the verdict which has been assessed against them both jointly should not be permitted to rest upon the appellant Hodges individuality.

The jury in writing its verdict was seeking not only to compensate respondent, but also to punish both appellants. It would hence be obviously unfair to compel the appellant Hodges to suffer for the punishment of both. It would follow, therefore, that if this company should have had a verdict directed in its favor, then the verdict should be set aside, and the appellant Hodges granted a new trial. This is in accordance with the general rule. The rule is thus stated.

"An entire judgment, jointly binding on several parties, if it is reversed as to one, must be reversed as to all."

This rule is supported by the weight of authority in this country. Thus it has been held by the United States Supreme Court in *Washington Gas Light Co. v. Lansden*, 172 U. S., 534; 19 Sup. Ct., 296; 43 L. Ed., 543, that—

"Where the rights and liabilities of defendants are so intermingled that, although there was error as to only one, it might work an injustice to others if the judgment was left intact as to them, the judgment will be reversed in toto."

It cannot be affirmed that a verdict of $2,500 would have been rendered against Hodges, a private citizen, if the suit had been dismissed against the corporation as it should have been.

I have devoted more attention to this case than my other duties perhaps justified, but I am deeply impressed with the far-reaching consequences of affirming this judgment, upon the administration of law and order.  In this day of an unprecedented crime wave, every encouragement should be extended to the guardians of the law, and, although individual instances of hardship may occur, these faithful protectors of society should not be themselves manacled, as I fear will be the consequence.

My conviction is that the Circuit Court should have directed a verdict in favor of both defendants, and that in any event the judgment against Hodges should be reversed, and a new trial granted.