UNITED STATES (MATTINGLY v.).
See Case No. 9,295.

## Case No. 15,744.

UNITED STATES v. MATTOCK et al.

[2 Sawy. 148.] [1]

District Court, D. Oregon. Jan. 27, 1872.

ILLEGAL PASTURING INDIAN LANDS—"CATTLE"—WHAT INCLUDED.

1. The word "cattle" in its primary sense includes sheep, and it is used in that sense in section 9 of the act of June 30, 1833 (4 Stat. 729), prohibiting any person from pasturing Indian lands with "horses, mules or cattle," under a penalty of $1 for each of such animals.

[Cited in U. S. v. Bridleman, 7 Fed. 896.]
[Cited in State v. Brookhouse (Wash.) 38 Pac. 862.]

2. Penal statutes, construction of.
[Cited in U. S. v. Trice, 30 Fed. 495.]

[Suit by the United States against C. Mattock and others for a penalty.]

Joseph N. Dolph, for the United States.
Orlando Humason, for defendants.

DEADY, District Judge. This action is brought under section 9 of the act of June

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

30, 1834 (4 Stat. 729), which enacts, that "if any person shall drive or anywise convey any stock of horses, mules or cattle, to range or feed upon any land belonging to any Indian or Indian tribe, without the consent of such tribe, such person shall forfeit the sum of one dollar for each animal of such stock."

The complaint was filed October 4, 1871, and alleges that the defendant on September 1, 1871, did drive and convey 1800 head of sheep upon the land within the boundaries of the Umatilla reservation, which then belonged to the Wallawalla, Cayuse and Umatilla tribes of Indians, pursuant to the treaty of June 9, 1855, between the United States and such Indian tribes; whereby, etc., defendant became indebted to the plaintiff in the sum of $1 for each head of sheep so driven, etc.

The defendant demurred to the complaint, because it did not state facts sufficient to constitute a cause of action. On the argument of the demurrer the only reason given in support of it was, that the term "cattle" as used in the statute does not mean sheep.

I think it is apparent from the following citations that the term, in its primary sense, includes sheep and all other animals used by man for labor or food.

Johnson defines "cattle" thus: "Beasts of pasture not wild nor domesticated." Richardson says the term is derived from chattels, and signifies bona mobilia, or movables. He defines it thus: "Kine, horses and some other animals appropriated to the use of man." Webster derives it from the Norman French "catal," or the Old English "catel," signifying "goods, cattle, movables." In the edition of 1837 it is defined as follows: "Beasts or quadrupeds in general, serving for tillage or other labor and for food for man. In its primary sense, the word includes camels, horses, asses, all the varieties of domesticated horned beasts or the bovine genus, sheep of all kinds and goats, and perhaps swine. * * * Cattle in the United States, in common usage, signifies only beasts of the bovine genus. * * * Yet it is probable that a law giving damages for a trespass committed by cattle breaking into an enclosure, would be adjudged to include horses." But the latest edition gives this definition: "Domestic quadrupeds collectively, especially those of the bovine genus, sometimes also including sheep, goats, horses, mules, asses and swine." The American Cyclopædia says: "In its primary sense, horses and asses are included in the term, as well as oxen, cows, sheep, goats, and perhaps swine."

But counsel for the defendant, admitting that the word "cattle" in its primary sense includes sheep, contends that the word as used in the act is restrained to animals of the horse or mule kind, in obedience to the rule of construction given in Smith, Const. Const. § 740, and cited with approbation in

U. S. v. Irwin [Case No. 15,445]: "Where general words follow an enumeration of particular cases, such general words are held to apply only to cases of the same kind as those which are expressly mentioned."

U. S. v. Irwin, supra, was an indictment for forgery of a land warrant under the act of March 3, 1825 (4 Stat. 119), which prescribed the punishment for forging any "indent, certificate of public stock, etc., or other public security of the United States." The court quashed the indictment, upon the ground that a land warrant was not embraced in the particular instruments enumerated in the act, they being evidence of a "pecuniary indebtment or liability of the government to the holder," nor in the general phrase "other public security," because that was restrained by the rule above mentioned to cases of the same kind with those particularly named.

But the case is not parallel in this respect with the one under consideration. To make it so, the act of 1834 should read "stock of horses, mules, or other animals." Then with good reason it might be said that under the recognized rule of construction the other animals must be of the same genus or kind with those named—horses and mules—and that sheep, not being of such genus or kind, are not included in the act. And even then it might be plausibly answered, that any animal that feeds upon the grass or herbage which grows upon the Indian land, and thereby impoverishes it, in respect to the purpose of the act, is of the same kind as the horse or mule.

The duty of the court, in construing this act, is to give effect to the intention of congress in enacting it; and this intention must be ascertained as well from the mischief which the act was intended to remedy as the words thereof. Smith, St. Const. Law, § 703.

The mischief to be prevented or remedied by it was the depasturing of the Indian lands by the stock of white persons. Sheep are as much within the reason of the enactment as horses or mules. It can hardly be presumed that congress intended to impose a penalty upon persons for feeding horses upon the Indian range, and at the same time permit them to cover it with sheep with impunity.

Although the word "cattle" in its primary sense includes horses and mules, at this day it is not often so applied in the United States. Therefore, I presume congress, out of abundance of caution, particularized that class of animals, and used the word "cattle" to describe all others included in the term. If the act had read "other cattle," there would be some reason for holding that the general phrase was restrained to other cattle of the horse genus or kind, if there be any such.

But here the term "cattle" is not used merely to round a period, or as an expletory embellishment of what precedes it, but as an independent and particular enumeration

of a class of subjects, in addition to those already named.

It is also urged that this is a penal statute, and therefore to be strictly construed. The rule as stated is admitted. But nothing more is meant by it than that such statutes shall not be extended, by what is known as equitable construction, to cases other than those which clearly appear to have been intended by the legislature, and are fairly included in the language used to express such intention. The intention, then, of the legislature is as proper a subject of inquiry for the court in the case of a penal statute as any other; and that intention when ascertained by applying the usual rules of construction is to govern in the one case as well as the other. The Enterprise [Case No. 4,-499]; U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 95; American Fur Co. v. U. S., 2 Pet. [27 U. S.] 367; U. S. v. Winn [Case No. 16,740]; U. S. v. Morris, 14 Pet. [39 U. S.] 464.

In this case it is manifest that the legislature intended to prevent Indian lands from being used by white people as pasture grounds for their stock, without the consent of the Indians. It will not be denied that sheep are as much within the mischief to be remedied as horses or oxen. The term used in the act—"cattle"—in its general and primary sense includes sheep. The term is also often used in common parlance, in the United States, in a narrower sense, to signify only animals of the bovine genus. This being so, the court must construe the act, and declare in what sense the term is used therein; and, in so doing, it is not justified in restricting the language used to any particular class of animals comprehended in the general term cattle, because the act is a penal one.

In U. S. v. Winn, supra, Mr. Justice Story says: "But when the words are general, and include various classes of persons, I know of no authority which would justify the court in restricting them to one class, or in giving them the narrowest interpretation, when the mischief which is to be redressed by the statute is equally applicable to all of them. And where a word is used in a statute, which has various known significations, I know of no rule that requires the court to adopt one in preference to another, simply because it is more restrained, if the objects of the statute equally apply to the largest and broadest sense of the word. In short, it appears to me that the proper course in all these cases is, to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature."

Bearing in mind the rule that the language of the act and the mischief to be remedied by it, must both be considered in ascertaining "the true intent of the legislature," I have no hesitation in coming to the conclusion that the word "cattle," as used in the Indian intercourse act of 1834, includes, and was intended to include sheep, as well as cows and oxen.

The demurrer is overruled.