UNITED STATES ex rel. GORDON v. CROOK, Major General.

(District Court, D. Nebraska. September 6, 1875.†)

1. INDIANS (§ 12*)—TREATY CREATING RESERVATION—REQUIREMENT OF RATIFICATION BY "CONGRESS."

The term "Congress," as used in an act appointing a commission to negotiate a treaty with Indians "subject to the action of the Senate," and to select a district or districts of country, "said district or districts when so selected and the selection approved by Congress" to be and remain a permanent home for the Indians to be located therein, means the lawmaking branch of the government, and the approval of both Houses was necessary to create a valid reservation of the district so selected.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 2, p. 1432; vol. 8, p. 7611.]

2. INDIANS (§ 12*)—INDIAN COUNTRY—CONSTRUCTION OF TREATY.

The treaty made by commissioners with the Sioux Indians April 29, 1868 (15 Stat. 635), under authority of an act of Congress empowering the commission to select as a reservation "a district or districts of country * * * to which the government has the right of occupation or to which said commissioners can obtain the right of occupation," and which, in addition to the designation of a reservation described by boundaries, further provided, in article 16, that "the country north of the North Platte river and east of the summits of the Big Horn Moun-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Received for publication July, 1910, and published because inadvertently omitted from Federal Cases.

tains shall be held and considered to be unceded Indian territory," and that no white person shall be permitted to settle upon or occupy any portion of the same, or to pass through it without the consent of the Indians, did not include in such unceded territory any land within the state of Nebraska.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 12.*]

3. INDIANS (§ 32*)—PERSONS AND PROPERTY UNLAWFULLY IN INDIAN COUNTRY—AUTHORITY OF MILITARY.

Rev. St. §§ 2147, 2150, 2151, authorize the military forces of the United States by direction of the President to be employed to prevent the introduction of unauthorized persons and property into the Indian country, which persons and property shall be proceeded against according to law, to remove persons found therein contrary to law, and to apprehend any person so found and convey him immediately by the nearest convenient and safe route to the civil authority of the territory or judicial district in which he is found, but expressly provide that he shall not be detained longer than five days after arrest and before removal. A civil action is authorized against property seized for a violation of the law and for the collection of a penalty imposed on any person who returns to the country after being once removed. *Held*, that the Military Department has no authority to hold a person apprehended for being unlawfully in the country indefinitely as a prisoner, nor to destroy property so found.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 32.*]

Habeas corpus, on relation of John Gordon, against George Crook, Major General Commanding the Military Department of the Platte. Hearing on writ and return. Order for surrender of petitioner to civil authorities.

Baldwin & Smythe, for relator.

Judge Advocate Burnham, for respondent.

DUNDY, District Judge. On the 22d day of July last, John Gordon, by his counsel, presented his petition in due form, in which he alleges that he was then restrained of his liberty by the respondent, Gen. Crook, without the shadow of law or authority therefor. A writ of habeas corpus was thereupon issued as prayed for therein. The writ was made returnable in 20 days; but it seems that no personal service thereof was ever made on the respondent. Nevertheless the respondent makes a voluntary appearance and answers fully to the said writ.

The relator admits the truth of the allegations contained in the return to the writ, supposed by the parties to be important and material, and upon the return to the writ, so admitted to be true, after the argument of the counsel, the cause was submitted for determination.

The return to the writ states, in substance, and the relator admits the facts to be:

First, that Gen. Crook is, and was at the time of issuing the writ, the commander of the military department of the Platte, and that the military officer in command at Camp Sheridan, where the relator was confined, was and is subject to the orders of the said Gen. Crook.

Second, that on the 17th of March, 1875, Gen. Sherman, by direction of the President of the United States, issued or caused Gen. Crook

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to issue an order to prevent all expeditions going into the Black Hills country so long as the present treaty with the Sioux Indians exists.

Third, that Gen. Sherman, on the 17th of March, 1875, ordered that:

"Should the companies now organizing at Sioux City and Yankton trespass on the Sioux Indian reservation, you are hereby directed to use the force at your command to burn the wagon trains, destroy the outfits and arrest the leaders, confining them at the nearest military post in the Indian country. Should they succeed in reaching the interior you are directed to send such force of cavalry in pursuit as will accomplish the purpose above named."

Fourth, that John Gordon, the relator, with many others, was arrested 16 miles below the mouth of Antelope creek, within what is claimed to be unceded Indian territory; the said Gordon being the reputed and acknowledged leader of the outfit, and whilst he, and they, were on their way to settle upon and occupy a portion of the Black Hills country which is a part of the unceded Indian territory.

Fifth, that said Gordon, immediately after his arrest, was conveyed to and confined at the military post of Camp Sheridan, and there remained until the time of issuing the writ herein.

Sixth, that the military officer having the immediate custody of the relator proposed to him (the relator) to discharge him from custody on his agreeing not to enter the Indian country in violation of law, and that the relator declined to make such promise.

It is conceded that Gordon was in no way connected with the military service of the government, and therefore not subject to the orders of the commander of the department of the Platte.

These facts involve the necessity of determining:

First, the character or condition of the country where the arrest of Gordon was made.

Second, the liability to be incurred by a person who goes into the Indian country without authority of law.

Third, how far the military authorities are justified in going to arrest, imprison, or expel therefrom parties found in the Indian country.

Fourth, the duty of the military authorities after an arrest has been made.

On the 20th of July, 1867, Congress passed an act entitled "An act to establish peace with certain hostile Indian tribes" (15 Stat. 17, c. 32), in which it provided that:

"The President of the United States be, and he is hereby, authorized to appoint a commission to consist of three officers of the army not below the rank of brigadier general, who, together with N. G. Taylor, commissioner of Indian affairs, John B. Henderson, chairman of the committee of Indian affairs of the Senate, S. S. Tappon and John B. Sanborne, shall have power and authority to call together the chiefs or headmen of such bands or tribes of Indians as are now waging war against the United States, or committing depredations upon the people thereof, to ascertain the alleged reason for their acts of hostility, and in their discretion under the direction of the President, to make and conclude with said bands or tribes, such treaty stipulations, subject to the action of the Senate, as may remove all just causes of complaint on their part, and at the same time establish security for person and property along the lines of railroad now being constructed to the Pacific and

other thoroughfares of travel to the western territories, and such as will most likely insure civilization for the Indians, and peace and safety for the whites."

The second section of the act referred to further provides:

"That said commissioners are required to examine and select a district or districts of country having sufficient area to receive all the Indian tribes now occupying territory east of the Rocky Mountains not now peacefully residing on permanent reservations under treaty stipulations, to which the government has the right of occupation or to which said commissioners can obtain the right of occupation. * * * Said district or districts, when so selected, and the selection approved by Congress, shall be and remain permanent homes for said Indians to be located thereon. * * *"

In pursuance of the authority conferred by the said act of Congress, a treaty was made with the hostile Sioux Indians, at Ft. Laramie, on the 29th of April, 1868 (15 Stat. 635), which was ratified by the Senate on the 16th of February, 1869.

The second article of this treaty agrees:

"That the following district of country, to wit, viz., commencing on the east bank of the Missouri river, where the forty-sixth parallel of north latitude crosses the same, thence along low water mark down said east bank to a point opposite where the northern line of the state of Nebraska strikes the river, thence west across the said river and along the northern line of Nebraska to the one hundred and fourth degree of longitude, west from Greenwich, thence north on the said meridian to a point where the forty-sixth parallel of north latitude intercepts the same, thence due east along the same parallel to the place of beginning. * * *"

The sixteenth article of the treaty declares:

"That the country north of the North Platte river, and east of the summits of the Big Horn Mountains shall be held and considered to be unceded Indian territory, and also stipulates and agrees that no white person or persons shall be permitted to settle upon or occupy any portion of the same, or without the consent of the Indians, first had and obtained, to pass through the same. * * *"

It has ever been the policy of our government to treat the several Indian tribes as "dependent domestic nations." No other government, state or individual, is permitted to treat with them for any purpose, without the consent of the general government. Nevertheless, the government accords to them a sort of sovereignty which seems to justify the exercise of the treaty-making power. The uniform practice of the government for many years was to treat with the tribes as was done in independent nations. But in later years dissatisfaction at this policy has manifested itself in as well as outside of Congress. Hence we see in the act of Congress, before referred to, that the commission to treat with the hostile Sioux was very much restricted in its powers.

It is true that the treaty when made was to have no binding force until it should be ratified by the Senate, and it is equally true that part of the treaty which sets apart the said reservation was to have no binding force until it was approved by Congress. It seems that the Senate ratified the treaty as required by the first section of the act of Congress, creating the commission.

But I have seen no act or resolution indicating in any way that Congress approved of the selection of the reservation. Argument was

advanced to show that a ratification by the Senate alone of the treaty was sufficient. But it is only fair to presume that Congress meant precisely what is stated when its approval was required. The term "Congress," as here used, and as is generally used and understood, means the lawmaking power of the government; and we are not authorized to give it any other meaning here. If these views are correct, it necessarily follows that the portions of the treaty setting aside certain country as a reservation and declaring certain other parts of territory as unceded Indian country have no binding force until the same is approved by Congress.

But if the treaty was made in all respects in strict conformity to the act of Congress authorizing the making of it, it then becomes a serious question as to whether or not Gordon was arrested in that part of the country called by the treaty "unceded Indian territory." The arrest was made on the Niobrara river, about 16 miles below the mouth of Antelope creek, and in the state of Nebraska, but at a point some distance west of a line running north from the mouth of the North Platte river. Counsel for Gordon very strenuously insists that no part of the "unceded Indian territory" lies within the boundaries of the state of Nebraska. After a careful examination of this question, a question in which the people of this state justly feel a deep concern, I conclude that no part of the "unceded Indian territory" described in the treaty is included within the limits of the state of Nebraska, and that the parties to the treaty neither so understood nor intended it, at the time of making the treaty. I think I ought to hesitate long and scrutinize closely a treaty which is claimed consigns near one-fifth of our state to the exclusive use of a semicivilized race, and that, too, without the sanction of the state authorities, and against the known and expressed wishes of the people of the state, before I so decide, unless the terms of the treaty require such a decision.

It will be observed that the boundaries of the tract of land intended for the reservation are described with the utmost particularity. The description is as specific and definite as language can make it. Commencing at a point at low-water mark on the east bank of the Missouri river, the line then runs down the east bank of that river, to a point opposite to where the northern boundary of Nebraska strikes the river; thence across the river to the corner of the state; thence west along the state line to the western boundary of the state; and thence north, etc. So particular were the parties to the treaty about this description that no effort seemed to have been spared to make it clear that they intended to include the bed of the Missouri river in the reservation. About the boundaries of this reservation and "permanent homes" of the Indians there is no chance for dispute. But while the boundaries of this reservation are certain and specific, the boundaries of the "unceded Indian country" are vague, uncertain, and indefinite as language can well make them. For this reason we are left to give the sixteenth article of the treaty a construction, and ascertain as well as we can what country was really intended to be included as unceded territory. The treaty declares that the country north of the North Platte river and east of the summit of the Big Horn Mountains shall

be regarded as the unceded country. It is fair to presume that the commissioners well understood the boundaries of this state, because in defining the boundaries of the reservation they follow the northern boundaries of the state its full length. The moment the western boundary is reached they conclude to make the western line of the state the western line of the reservation. So that the action of the commissioners seems to have conformed to the state boundaries, and that they did not any time intend to interfere in any way with any part of the territory included within this state. Again, it would seem that no part of the state was intended to be included in the unceded territory, because that territory lies north of the North Platte river, and east of the summit of the Big Horn Mountains. The northwest corner of Nebraska is in a direct southeast course from the southern extremity of the Big Horn Mountains. It will be seen then that, if it was ever intended to include any part of the state in the unceded territory, the words used to describe it are not very apt ones. Then, too, if it had been so intended, what an easy matter it would have been to say so. How easy and how natural it would have been to designate the mouth of the North Platte river as the starting point of the eastern boundary of the unceded territory.

One of the avowed objects in making the treaty was to protect the persons employed in constructing and operating our great national thoroughfare—the Union Pacific railroad—and the language of the act of Congress authorizing the treaty "and such as will most likely insure civilization for the Indians, and peace and safety for the whites." "Peace and safety for the whites," in a country such as that traversed by the Union Pacific railroad, was, at the time of making the treaty, and still is, regarded as of some consequence, and, the better to insure this, it was deemed advisable to remove the Indians as far from the road and settlements as possible. This was done by locating them north of the state, as provided in article second of the treaty. And in the absence of language clearly expressing the intention of the contracting parties so to do, we cannot safely infer that they intended to include any part of the Union Pacific Railroad in the unceded territory, which would be done if all the country north of the North Platte river were to be included in the unceded Indian territory. It is more consonant with reason to suppose that this never was intended. When we consider the fact that the paramount object in making the treaty was the protection of the railroad company in building and operating its road, and the protection of persons and property of the whites, we can readily see that the commission would be quite unlikely to set apart a section of country in and through which the Indians might come at will, and in which the more fortunate, but less favored, white man could not place his foot without violating the laws of his country, and that, too, when the road passes over a portion of it, and where much of it is in close proximity to the road and the settlements along the same.

These considerations have induced me to hold that no part of the "unceded Indian territory" described in the sixteenth article of the treaty is within the limits of the state of Nebraska.

But should we concede to the country described in the second and sixteenth articles of the treaty the character claimed for it by the relator, then it becomes necessary to determine how far the military authorities are justified in going, for the purpose of carrying out the provisions contained in the two articles as aforesaid, and expelling therefrom unauthorized persons. Both articles declare, in substance, that no white persons shall be permitted to pass over, settle upon, or reside in, the territory described therein, save and except a few officers of the government who may be required to do so under certain provisions of the treaty, which are unnecessary to here consider.

Section 2147 of the Revised Statutes provides that:

"The Superintendent of Indian Affairs, and the Indian agents and sub-agents shall have authority to remove from the Indian country all persons found therein contrary to law; and the President is authorized to direct the military force to be employed in such removal."

This section gives the clear and undoubted right to the President to direct the military force to be employed in removing unauthorized persons from the Indian country; and, when the President so directs, then the military authorities can use all the force necessary to expel the intruder. This would necessarily include the right to arrest the intruder and to use all the force necessary to overcome any resistance, actual or threatened.

Section 2150 of the Revised Statutes goes still further, and declares that:

"The military forces of the United States may be employed in such manner and under such circumstances as the President may direct: First. In the apprehension of every person who may be in the Indian country in violation of law; and in conveying him immediately from the Indian country, by the nearest convenient and safe route to the civil authority of the territory or judicial district in which such person shall be found, to be proceeded against in due course of law. Second. In the examination and seizure of stores, packages, and boats, authorized by law. Third. In preventing the introduction of persons and property into the Indian country contrary to law, which persons and property shall be proceeded against according to law."

Here is ample authority for using the military force of the government for the purpose of not only removing intruders from the Indian country, but to prevent them from going upon forbidden ground.

But the authority here conferred must be exercised in the mode and manner pointed out in the section of the law just quoted. That requires the offender to be removed immediately, by the nearest convenient and safe route, to the civil authority of the territory or judicial district where the offender is found.

Section 2151 of the Revised Statutes expressly declares that:

"No person apprehended by military force, under the preceding section, shall be detained longer then five days after arrested and before removal. * * *"

The conclusion, therefore, is that when a white person is found passing over, residing in, or settling on, any portion of the Indian country, the military force may, when so directed by the President, arrest and, within five days thereafter, remove him by the nearest

convenient and safe route to the territory or judicial district in which the arrest is made, there to be proceeded against as provided by law..

The respondent produces a general order from his superior officer (Gen. Sherman), directed to the commander of the department of the Platte, which seems to have been issued last March, from which the following is an extract:

"Should the companies now organizing at Sioux City and Yankton trespass on the Sioux Indian reservation, you are hereby directed to use the force at your command to burn the wagon trains, destroy the outfit, and arrest the leaders, confining them at the nearest military post in the Indian country. * * *"

Notwithstanding the distinguished character of the officer, and the high source from which this order emanates, it is respectfully submitted that that portion of the order which directs the burning of any part of the captured property is wholly unauthorized by law. The third subdivision of section 2150, before quoted, declares:

"Such persons and property shall be proceeded against according to law."

Section 2125 (Revised Statutes) also declares that:

"When goods or other property shall be seized for any violation of this title, it shall be lawful for the person prosecuting on behalf of the United States to proceed against such goods or other property, in the manner directed to be observed in the case of goods, wares or merchandise brought into the United States in violation of the revenue laws."

If the laws work or declare no forfeiture of goods, when the owner commits a wrongful act, then surely no person has the lawful right to destroy them. If the improper or unlawful use of goods results in a forfeiture of the same, then, the moment of the commission of the wrongful act, the title to the goods so used changes and rests in the government. And when the goods can be seized and reduced to possession, it is the duty of the officer seizing the same to protect and place them in position to be proceeded against as provided in said section 2125, in order to have the forfeiture judicially declared and the property sold for the benefit of the government. When this course is taken, both the government and the claimant of property have every desirable facility afforded them for maintaining their respective rights. Here the cause of the seizure is inquired into, and the right to make it is either established by the government or overthrown by the claimant. This course of procedure fully accords with the humane spirit of our laws, and is so obviously just that it needs no commendation here. No argument is necessary to show the wisdom and utility of such a course. Both are self-evident and must so appear to the most careless and casual observer. And when Congress, in the exercise of its constitutional powers, declares what disposition shall be made of the captured and forfeited property, it becomes the duty of all alike to obey the law, and none are safe in violating it even in the Indian country.

Notwithstanding the said treaty and several provisions of the old "intercourse law" (the same from which quotations are herein made) forbid white men trespassing on the Indian country, nevertheless no

penalty is thereby incurred by an intruder for the first offense. At least no one but an alien incurs any penalty therefor. But if the offender returns to the Indian country after having been removed therefrom, then he incurs a penalty which is fixed and certain.

Section 2148 of the Revised Statutes reads as follows:

"If any person who has been removed from the Indian country shall thereafter at any time return or be found within the Indian country he shall be liable to a penalty of one thousand dollars."

And even when this offense is committed, and this penalty is incurred, the proper proceeding to be instituted against the accused is to bring an action in the nature of an action of debt to recover the penalty.

Section 2124, Rev. St., provided that:

"All penalties which shall accrue under this title, shall be sued for and recovered in an action in the nature of an action of debt, in the name of the United States, before any court having jurisdiction of the same, in any state or territory in which the defendant shall be arrested or found. * * * "

This remedy is well understood and seems to be the only one to be pursued in the federal courts in prosecutions instituted against those who incur the penalty provided by section 2148, before referred to. Then in no case like the one under consideration can the criminal process of the federal courts be invoked. And if the government has not provided an adequate remedy, one that is commensurate with the offense itself, it must be content to pursue the only remedy furnished until a better one can be provided by due course of law.

It is therefore ordered that the respondent, Gen. George Crook, brigadier general and brevet major general of the United States army, commanding the military department of the Platte, turn over and deliver up, without unnecessary delay, the said John Gordon, to the United States marshal for the state of Nebraska, to be proceeded against as provided by law.

The clerk of the United States District Court for said state will forthwith make an official copy of this order and place the same in the hands of said marshal for immediate service.