JANUS, Superintendent of Indian Agency, et al. v. UNITED STATES ex rel. HUMPHREY.
No. 5910.

Circuit Court of Appeals, Ninth Circuit.
Feb. 17, 1930.

S. Attys., all of Boise, Idaho, for appellants Janus and Jensen.

O. M. Fox and H. R. Turner, both of Pocatello, Idaho, and John Ralph Wilson, of San Francisco, Cal., for appellant Maryland Casualty Co.

Roy L. Black, W. H. Anderson, and W. H. Witty, all of Pocatello, Idaho, for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

The appellee moves to dismiss the appeal in this case upon the ground that it was taken too late. The judgment was entered herein, October 25, 1928, during the October term of the District Court. Said term of court was adjourned without day on October 30, 1928, appellants filed petition for new trial November 3, 1928. No specific order was made by the court, before adjourning, extending the time beyond said term for appellant to file a motion or petition for new trial. The rules of that court, however, did provide that a petition for a new trial could be filed within thirty days after the rendition of the judgment. The trial court filed a memorandum opinion (30 F.[2d] 530), on the motion for new trial on January 29, 1929, holding that the verdict was so disproportionate to the injuries sustained by the plaintiff that unless within twenty days thereafter plaintiff filed a remission of all of the judgment above $1,900, the judgment be set aside. This remission was filed on the 4th of February, 1929, and on the 5th of February, the motion for new trial was formally denied. The appellee does not dispute the right of the trial judge to rule on the motion for new trial, notwithstanding the fact that the petition for new trial was filed after the adjournment of court. Appellee's position is stated in his brief as follows:

"Rule 75 of the Rules of Procedure of the United States District Court for the District of Idaho provides thirty day period after the entry of judgment for the filing of a petition for new trial and does not, in any manner, conflict with the rule urged by appellee. Under said rule 75, appellants could file their petition for new trial within thirty days and could file their petition for writ on appeal within the three months' period following the entry of judgment. Such petition for new trial and writ on appeal can be issued in time and in conformity to above rule by the filing of the petition for new trial after the term had closed and within the said thirty day pe-

Hoyt E. Ray, U. S. Atty., and Sam S. Griffin, and William H. Langroise, Asst. U.

riod, but the filing of said petition for new trial within said thirty day period and after the term had closed did not toll or suspend the three months' period within which it is required to file the petition for writ on appeal.

"The only way that the three months' period for the filing of the petition for writ on appeal can be extended is by the filing of the petition for new trial before the close of the term of the court when the court still has jurisdiction to modify, change or correct its judgment. If the petition for new trial is filed during the term, it tolls or suspends the statute upon the sole theory and basis that the court has not allowed its judgment to go out of its control or jurisdiction but still retains jurisdiction because of the pendency, before the close of the term, of the petition for new trial." ·

The position of the appellee is entirely inconsistent with the theory upon which the period for taking an appeal is extended in the event that a petition for new trial is filed. Morse v. United States, 270 U. S. 151, 46 S. Ct. 241, 70 L. Ed. 518, and cases cited. The standing rule of the court (rule 75), permitting the filing of a petition for new trial within thirty days after the rendition of a judgment, in effect continued the term for that purpose during the full period of thirty days, otherwise construed the rule would operate as a trap for the unwary. This much seems to be conceded by the appellee. If it be held, as we think it must be, that the petition for a new trial herein was filed in time to invoke the power of the trial court to act upon the petition for a new trial, the petition also tolled the period for the filing of the appeal. The motion will be denied.

This is an action for false imprisonment and is based upon an alleged illegal arrest and detention of appellee, Roy Humphrey, by the appellant, W. H. Jensen, alleged to have been acting under the orders of Stephen Janus, Superintendent of the Ft. Hall Indian Agency, Idaho. The undisputed facts and circumstances in connection with the arrest and detention are as follows:

The appellee, Roy Humphrey, was in charge of herding the sheep of Eames and Hanson. Working under him as a sheep herder was one Chase. These sheep were being pastured between Bannock Peak and Quartz Peak within the Fort Hall Indian Reservation, belonging to the Bannock and Shoshone tribes and set aside for the grazing of Indian cattle. Appellant Jensen was informed that the sheep were being pastured on the reserve, and, acting upon that information, proceeded to the point where the sheep were grazing and there found appellee, Humphrey, in charge of 2,000 sheep which were grazing a mile on each side of the trail as they drifted along. Jensen arrived at the camp of the appellee, Humphrey, about 11 o'clock on the morning of July 13, 1927. Humphrey appeared there about a half hour later. Chase was out with the sheep. Jensen thereupon informed Humphrey that as he was pasturing sheep on the reservation, the owners of the sheep and Humphrey and Chase, as well as the sheep, would be held to pay damages for trespass. He thereupon placed Humphrey under arrest, and later Chase, and after lunch together, all started about 12:30 for Pocatello, Idaho, the nearest point at which a United States Commissioner was accessible. A part of the distance they traveled by horse along the mountain trails, and the latter part of the journey by Jensen's automobile, and arrived at the sheriff's office at Pocatello at about 5 o'clock p. m. There Jensen immediately got in communication with the office of the United States Commissioner at Pocatello and ascertained that the commissioner was not at his office but was at his ranch about fifteen miles from Pocatello. There was no telephone at the ranch of the United States commissioner. Thereupon, Jensen left Humphrey and Chase in charge of the sheriff while he sought the United States commissioner. Jensen at once saw the son of the commissioner at Pocatello, who was a deputy clerk of the United States District Court and who sometimes prepared papers for his father, the commissioner, and advised him he desired to file a complaint against Humphrey and Chase for the trespass they had committed on the reservation by pasturing sheep thereon. The son, Theodore J. Turner, Jr., testified concerning the incident which occurred around seven or eight o'clock, as follows:

"Jensen said he wished to lodge a complaint against two men that were found with sheep trespassing on the reservation. I got the Revised Statutes and General Code and went through them trying to find a section under which to draw such a complaint. I told him that I found one section that dealt with trespassing, but was unable to find anything further. I told him the complaint could not be completed because my father was not in town and that I would have to check further because, with the information I had available, I didn't know how to draw it. I prepared just the formal parts of a complaint that night."

### Cross Examination

"My father was not in his office at any time during the afternoon or evening of July 13th or during the day of July 14th. On the morning of the 14th I took some papers out to my father at the request of Mr. Jensen made on the night of July 13th."

Jensen immediately thereafter went to the ranch of the commissioner on the evening of July 13th. With reference to this visit of Jensen to the commissioner, Jensen states positively that he visited the commissioner that evening, and this is undisputed, although the commissioner did testify that he did not, at the time of the trial, remember that visit. In the meantime, Humphrey telephoned from the jail, or the sheriff's office that evening, to Eames, his employer, the owner of the sheep, who arranged the following morning between eight and eight thirty for attorney Black to look out for his interests and to represent Humphrey and Chase. At 9 o'clock on the morning of the 14th, attorney Black, representing Humphrey and Chase and Eames, failing to reach the United States commissioner at his office in Pocatello, went with Eames to the office of the reservation to confer with the appellant Janus, the superintendent, concerning the release of the men in jail and the release of the sheep. The son of the United States commissioner arrived at the reservation a little later on his way to the commissioner's ranch, which was three and a half miles from the office on the reservation. The commissioner's son had with him the formal part of the complaint and blanks without which the commissioner, the evening before, said he could not act.

During the discussion between attorney Black and Janus the question arose as to what provision of the law had been violated by Humphrey and Chase. Both had in mind section 179, tit. 25, USCA, fixing the penalty at $1 per head for horses, mules, or cattle trespassing upon lands belonging to an Indian or an Indian tribe without the consent of such tribe. Mr. Black, who represents the appellee Humphrey in this action, testified with reference to that meeting, in part, as follows:

"I said to Mr. Janus, 'I came to see you about some men you have locked up in jail at Pocatello, a man named Humphrey and Chase.' * * * I said, 'I do not find any law upon which you can hold the men for any criminal offense—if any trespass, if they were trespassing on the reservation.' He said, 'Well, there is a law.' I said, 'I have the statutes of the United States here and I have been looking at it all morning and I can't find any such law, and I think the imprisonment is unlawful,' and asked him to show me the statute, if there was such a statute or law. He says, 'I don't have to show you the law. I know the law. If you don't, it is your hard luck.' I said, 'Do you mean to tell me that you can imprison men for trespassing on the reservation, put them behind bars and prosecute them?' He says, 'I do.' I said, 'Won't you release these men?' He said, 'No.' I said, 'Have you a criminal complaint filed against them?' He said, 'No, but I am going to,' had one in his pocket made out and was going to file it right away. I said, 'I would like to have it filed so that we have these men give bond and not have to stay in jail. They are ready to give bond and can satisfy a reasonable bond, so that they can have their liberty and we can thresh things out afterward. He said, 'Well, I am going to have this filed right away with U. S. Commissioner Turner,' and I said, 'Well, now, I want to see if we can make some adjustment, settle this question of damages for trespassing, if there was any' and asked him how much he claimed for damages. He said five hundred dollars. 'Well,' I said, 'that looks to me like an unreasonably high amount for damages for sheep at that particular place and so short a time.' He said, 'It is $500.00, and if you don't pay it today, tomorrow morning it will be $1,000.00 and the next day it will be $1,500.00 and I will sell the sheep.' I said, 'Mr. Janus, I find a statute here—we had the statute that Mr. Langroise read to you this morning where it speaks of trespass by horses, cattle and mules on the reservation and making the trespass one dollar a head.' I said, 'I do not see where the statute uses the word 'sheep.' Do you have in mind any such statute?' He said, 'I know there is such a law.' I said, 'Would you mind looking it up as I do not find any where where it uses the word 'sheep.' We all commenced to look. We did not find any other statute except the one that Mr. Langroise read, which makes it a trespass to drive horses, cattle or mules on the reservation. I said, 'Well, Mr. Janus, I am not satisfied it is a trespass for sheep to be on the reservation, and I will go back to the office and I will take up with you later as to the damages.' As I left I asked Janus, I said, 'Now it is very important that we have you file the charge before the commissioner so that we can give bail, and not have to stay in jail,' and he said, 'I will have it filed right away.' I said, 'Will you let me know as soon as it is filed so that I can arrange a bond?' and he said, 'I will,' and I left."

About two or three o'clock in the afternoon, appellee Humphrey called his attorney from the county jail, and, in pursuance of the call, attorney Black telephoned Janus and was told that the complaint had been filed, that Jensen was out with the papers and that the men would be taken before the commissioner right away. He said, "I think Jensen is in Pocatello now, but I am not sure." About 5 or 5:30, in pursuance of another question of Humphrey, attorney Black called the Indian reservation and got in touch with Jensen over the telephone and said:

" 'Jensen, I thought you were coming here this afternoon to arrange to take these men before the commissioner.' He said, 'I haven't got around to it, but I am coming in a few minutes.' I said, 'Will you see that you do that right away, or these men will have to stay in jail over night again. Now, Jensen,' I said, 'I wish you would ask Janus if the $500.00 would be the least amount he would take to settle the trespass,' and he talked to some one * * * and answered that that was the amount that would have to be paid, 'If I send Eames out there will you take his check?' He said, 'Not unless it is certified.' I said, 'Will you take my check?' and he said 'Yes.' So I told him I would send Eames out with it. I made out a check and gave it to Eames. He took it and left for the reservation.' * * *

"There was no question in my mind that the officers on the reservation have a right to remove a trespasser from the reservation, but did not have the right to put them in jail. You would have to use sufficient force to take them off the reservation. Under the law at that time, I believed they had no right to arrest, but did have a right to remove them. The power to remove does not necessarily imply the power to arrest, but they have the power to remove from the reservation. I thought they could remove them from the reservation. I do not know that I had any idea about the word 'arrest.' They could remove them however. They can take hold of them if they refuse to get off the reservation; if they don't go, they can take hold of them, carry them off. That is the law, and could detain them while doing so. At the time of my conversation with Janus, I knew that there was a penalty in the statute providing that 'Every person who drives or otherwise conveys any stock of horses, mules, or cattle to range and feed on any land belonging to any Indian or Indian tribe, without the consent of such tribe, is liable to a penalty of $1.00 for each animal of such stock.' You could call it a penalty, but not a criminal penalty, which may be assessed against the person. I asked Janus if there was any other statute that he knew that used the word 'sheep,' because these were sheep and the statute only included horses, mules and cattle. I didn't know in the morning when I was out there, that any court had held that the word 'cattle,' insofar as the Indian reservations were concerned, included 'sheep,' but I read that in the afternoon."

It will be observed that there was no request by Black that the appellees be taken before a justice of the peace or any officer other than the United States commissioner, but on the contrary that Black requested that the complaint be filed before the United States commissioner. Attorney Black returned to Pocatello, and, after examining the authorities in his office, came to the conclusion that the word "cattle" used in the statute referred to (Title 25 USCA § 179), included sheep. This had been decided as early as 1872. See United States v. Mattock, 2 Sawy. 148, Fed. Cas. No. 15744; U. S. v. Stocking (D. C. Mont.) 87 F. 857; Ash Sheep Co. v. United States, 252 U. S. 159, 40 S. Ct. 241, 64 L. Ed. 507.

After the meeting at the office of the Indian reservation, Jensen repaired to the commissioner's ranch where he found the commissioner and stated to him the facts upon which he based a complaint charging appellees Humphrey and Chase with trespass by pasturing the sheep upon the Indian reservation, and a complaint was signed by Jensen before the commissioner, but the evidence is not clear as to whether or not it was sworn to. In the charging part of the complaint the statute alleged to have been violated was omitted and the commissioner expected Jensen to supply it, although Jensen did not so understand it. Jensen returned to the reservation and made further search to ascertain the section of the statute which covered the offense of pasturing sheep upon an Indian reservation. The commissioner, however, did not come to his office in the afternoon as he had agreed, but spent the afternoon attempting to get some one to take care of his own cattle on his ranch, and in concluding a cattle deal. He did not return to his ranch until the evening of July 14th.

In the meantime, Eames met the appellant Jensen coming from the reservation into Pocatello just about dusk, and gave him the check for $500. Thereupon Jensen informed the United States Commissioner that the damage for trespass had been settled and desired to know whether or not it would be

proper to release the defendants and was informed by the commissioner that it was proper to release them. Thereafter, they were ordered released. The exact time of release, whether at 5:30 p. m. or at 9 p. m. is in dispute.

In view of the contention of the appellants that the payment of $500 was in complete settlement of all matters involved in the transaction, including the claim for false imprisonment, additional facts should be stated.

At the time of the arrest, appellant Humphrey stated he did not want to leave the sheep owing to the danger of losing some during his absence. On the night of the 13th he got in touch with his employer, Mr. Eames, by telephone, and asked Eames to take care of the matter for him. Mr. Eames employed Mr. Black, as attorney for appellee, Humphrey. Mr. Eames testified that he was prepared to give a bond at any time to get the men out of jail and get them back to the sheep. He stated, "they had two kids out with the sheep, one Indian, and I was prepared to give any kind of a bond, anyway I could get the men out there, and I communicated that fact to Janus." When he handed the check for $500 to Jensen, as above mentioned, he asked for a receipt and said: "I would like very much to get these men out, so they could get back to the sheep the first thing in the morning. He said he was going to Pocatello then and would see about getting them out. I said, 'All right, I will be at the jail when you get there.' I drove back and went to the jail. I was there three-quarters of an hour when Jensen came. * * * We went to a hotel and left the next morning early and after driving as far as we could with the car and rounding up the horses, it was about three o'clock in the afternoon when we got to the sheep."

He also testified: "I was worried about the sheep and I was working to get the men released throughout it all, because I have to have these men and I told Black that the main thing was to get the men out and then we would take up the fixing of the damages of the sheep, whatever it was."

He stated when he paid the $500 for damages done by the sheep, he had no idea but that his men would be turned loose. Mr. Black testified that he considered the payment of $500 was for the damages done by the sheep and that he still expected the criminal proceeding to go forward. Eames, however, was the one who conducted the final negotiations and it is clear from the testimony, of both Eames and Jensen, that appellant Humphrey was to be released.

This action was brought on the theory that the arrest and detention of the appellee was entirely unauthorized and unlawful. The trial court, however, ruled correctly that the penalty of $1 per head for each sheep was one which could be collected by criminal proceedings, and that the arrest of Humphrey and Chase, without a warrant, was justified because of the fact that this offense was committed in the presence of Jensen. It is assumed by both parties on this appeal that the holding of the trial court in that respect was correct. We will return to a discussion of this point later in the opinion and for the present we will proceed on the theory that the arrest was proper.

It will be observed that upon the arrest, the arresting officer proceeded immediately to take the appellee to the nearest United States commissioner. Apparently the judgment for false imprisonment in this case is not based upon the illegality of the arrest nor the illegality of the detention of the appellant for a reasonable time after the arrest, but upon the finding of the jury that an unreasonable period elapsed before the appellee was taken before the magistrate. The inquiry then resolved itself into this question:

At what point in the proceedings was it the duty of the arresting officer to release his prisoner? In the argument on appeal appellee's claim of unreasonable detention is based largely, if not altogether, upon the fact that the arresting officer failed to take his two prisoners out to the ranch of the United States commissioner on the evening of their arrest. This position, however, is clearly untenable. It was the duty of an officer, making an arrest without a warrant, upon discovering the absence of the magistrate from his office, to place his prisoners in jail and make an effort to secure the attendance of the magistrate at his office. See Markey v. Griffin, 109 Ill. App. 212, 222; Venable v. Huddy, 77 N. J. Law, 351, 72 A. 10; Kent v. Miles, 65 Vt. 582, 27 A. 194; Kent v. Miles, 68 Vt. 48, 33 A. 768. Whether this rule applied to the appellant Jensen, we will discuss later. At or before office hours Mr. Eames, representing the appellee, as his employer, and Mr. Black as the attorney for both, got in touch with the appellants and contended that the act committed by the appellee was not a criminal offense and that the arrest, therefore, was un-

437

lawful. At the same time they opened negotiations on behalf of appellees as well as the employer to settle the claims for trespass. The appellee cannot take advantage of delays due to his own conduct, and that, of course, includes the conduct of those who represent him. Blocker v. Clark, 126 Ga. 484, 54 S. E. 1022, 7 L. R. A. (N. S.) 268, 8 Ann. Cas. 31. It is obvious that some of the delay in the further proceeding was due to the insistence of attorney Black, that, notwithstanding the fact that his client had done the act, with which he was charged, the arrest therefor was wrongful. A part of the delay was also due to the fact that the attorney erroneously claimed that section 179, tit. 25 USCA, did not cover trespasses by sheep. At that time also section 105 of Regulations of Indian Service, hereinafter set forth, was brought to the attention of attorney Black, and, notwithstanding that section, he still contended that the arrest was unlawful. The contention of attorney Black resulted in an effort of the United States commissioner and of the appellants to try to find a provision in the Revised Statute which covered the penalty for trespassing sheep and provided for the arrest of the persons responsible for the trespass. Jensen, the arresting officer, had placed the facts before the commissioner on the evening of the 13th; the commissioner had been in the habit of making out complaints, and, in this instance, did make out a complaint stating the facts of the trespass but did not issue a warrant or regard the complaint as complete because of the absence of the reference therein to the statute violated. We will not pause at this time to further analyze the rights and duties of an arresting officer as determined by the court and jury for the reason, as will presently appear, that our view concerning that matter is not in accord with the holding of the trial court for reasons not pressed on this appeal by either of the parties, although clearly involved.

 A timely motion for a directed verdict was interposed and an exception noted to its denial. We will proceed with the discussion of the instructions given and refused, on the theory on which the case was tried, namely, that it was the duty of the appellants to take the appellee before a magistrate without unnecessary delay.

The appellants requested the following instruction: "What is a reasonable time for an officer to detain an arrested person before taking him before a United States Commissioner is impossible for comprehensive definition; it depends upon the circumstances of each case and is for you to determine upon consideration of all evidence; in such determination, you should consider the accessibility of a Commissioner; whether or not and when he was available for the purpose, his distance from the place, the safety with which the person arrested might be taken before him, and all other facts and circumstances then existing. During such time as you may find was reasonable, the officer had the right and it was his duty to detain the arrested person in some safe and convenient place.

"So if, in this case, you find that Jensen arrested Roy Humphrey for an act, unlawful under the laws of the United States, committed in his presence, and confined Humphrey in the Bannock County, Idaho, jail at Pocatello and proceeded without unnecessary delay under the circumstances to bring him before the United States Commissioner, you will return a verdict in favor of defendants."

This instruction was a proper one, upon the theory upon which the case was tried, and is not covered by the instructions given by the court on the subject of unnecessary delay in taking the prisoner before a magistrate. In so far as this proposed instruction confined the attention of the jury to the duty to take the appellee before a United States commissioner and eliminated other judicial officers, it was a proper instruction under the circumstances, because the detention of the appellee until office hours of July 14th, was clearly proper. From and after that time appellee was insisting that proceedings be instituted before the United States commissioner and he cannot now be heard to claim that he should have been taken before a justice of the peace. See Richardson v. Dybedahl, 14 S. D. 126, 84 N. W. 486.

The instruction given by the court on that subject is as follows: "The law is that where an officer arrests a citizen without a warrant it is his duty without unnecessary delay to make a complaint against him, or have it made against him, in a proper court, and if the offense is one against the laws of the United States, before a United States Commissioner, or other judicial officer authorized by law which I will call attention to later. It isn't possible to give a comprehensive definition here and say just how long a time may elapse after one is arrested before he is taken—must be taken to the court. Sometimes a few hours would be too long a time; sometimes a day would be too long a

time; sometimes it might run over a few days, depending upon the circumstances in each particular case. In other words, you must judge this question whether or not the detention was unnecessary delay by the particular facts before you in this case. There is no hard and fast rule we can go by."

The instruction given omits entirely the point as to the accessibility of the magistrate, contained in appellant's proposed instruction which is of vital importance in the case at bar. Hayes v. Mitchell, 69 Ala. 455; Wiggins v. Norton, 83 Ga. 148, 9 S. E. 607; 19 Cyc. 354; 25 Corp. Jur. 492, 493; Brish v. Carter, 98 Md. 445, 57 A. 210; Burk v. Howley, 179 Pa. 539, 36 A. 327, 57 Am. St. Rep. 607; Caffrey v. Drugan, 144 Mass. 294, 11 N. E. 96.

■ Returning to the ruling of the trial court denying the motion for a directed verdict, we will now consider the duties of the appellant Jensen, as chief of police of the Indian Agency. It was contended in the trial court by the appellee and is here, that section 595, tit. 18, USCA, declared the obligation of the arresting officer to take the person arrested "before the nearest United States commissioner or the nearest judicial officer having jurisdiction under existing laws for a hearing, commitment, or taking bail for trial" and that the judicial officers thus referred to are those mentioned in 18 USCA § 591, which includes United States commissioners and also justices of the peace. The trial court so instructed the jury. It will be observed that both these sections deal with the duty of an officer making an arrest upon a warrant. Neither of them refer to the duty of an officer or individual acting without a warrant. Section 595, 18 USCA first appeared in an appropriation bill in 1894 (28 Stat. 416); again in an appropriation bill, section 19, 29 Stat. 184; see, also, 27 Stat. 609. The primary purpose of this enactment was to limit the mileage fees of the United States Marshal or other officer. United States v. Nix, 189 U. S. 199, 204, 23 S. Ct. 495, 498, 47 L. Ed. 775. The chief of the Indian police is a regular employee of the government at the reservation, serving for a stated salary or compensation, designated by the Superintendent Chief of Police who serves as such without additional compensation by reason of such designation (See Regulations of the Indian Office, §§ 104, 374), and would, therefore, be entitled to no mileage fees whatever on such arrest.

In John Bad Elk v. United States, 177 U. S. 529, 20 S. Ct. 729, 44 L. Ed. 874, it was held that section 788 of the Revised Statutes of the United States, now 28 USCA § 591, supra, has no application to an arrest by a police officer of an Indian reservation without a warrant and that 28 USCA § 504, giving marshals and deputies power to make arrests without a warrant, similar to that exercised by sheriffs and deputies of the respective states, did not apply to police officers of an Indian reservation. In order to arrive at the duties and obligations of such police officers in making an arrest, it is therefore essential to consider further the rights and duties of such officers, and for that purpose to consider the history of the law relating to the arrest of trespassers upon Indian reservations.

The act of March 30, 1802, provided a penalty not exceeding one hundred dollars, or an imprisonment not exceeding six months, for driving horses or cattle to range on lands allotted to an Indian tribe (2 Stat. 141, § 2), and authorized the military force of the United States to apprehend persons violating the provisions of the act, and immediately to convey them in the nearest convenient and safe route to the civil authority of the United States in some one of the three adjoining states or districts "to be proceeded against in due course of law." On demand of the person arrested, however, he was to be taken before the nearest judge of the Supreme Court, or superior court of any state there to give bail (section 16, Id.). By the act of June 30, 1834, the penalty for trespassing stock was fixed as at present at "one dollar for each animal of such stock." 4 Stat. 729, 730, § 9 (25 USCA § 179). The duty of the military force apprehending persons violating the act was to take the apprehended person "to the civil authority of the Territory or judicial district in which such person shall be found, to be proceeded against in due course of law." Id., § 23 (25 USCA § 223). By a supplemental act of June 12, 1858 (11 Stat. 329, 332), it was provided that the Commissioner of Indian Affairs is authorized and required to remove any person therein without authority of law, and authorized him to employ such force as was necessary to effect such removal. Id., § 2. This law is found now in 25 USCA § 222. The historical development of the legislation concerning trespass upon Indian lands indicates that the penalty for trespass now imposed by section 179, 25 USCA, may be recovered by either civil or criminal action, notwithstanding the provisions of section 201, 25 USCA, that all penalties which

"accrue under this title shall be sued for and recovered in an action in the nature of an action of debt, in the name of the United States, before any court having jurisdiction of the same, in any 'State or Territory in which the defendant shall be arrested or found, the one half to the use of the informer and the other half to the use of the United States, except when the prosecution shall be first instituted on behalf of the United States, in which case the whole shall be to their use."

This question was exhaustively considered, and so decided, by the United States District Court in Montana in 1898, in the case of United States v. Stocking, 87 F. 857, and a similar question in the U. S. Circuit Court in Oregon in 1883, in United States v. Howard, 17 F. 638, and was so held by the trial court in the case at bar. Although other authorities take a contrary view (United States v. Payne [D. C.] 22 F. 426; In re Seagraves, 4 'Okl. 422, 48 P. 272), we are inclined to follow the decisions holding that the penalty for trespassing cattle imposed by section 179, 25 USCA, may be recovered by criminal proceedings. We are moved also to that conclusion somewhat by the fact that section 201 (25 USCA) above quoted, refers to an "arrest" and to a "prosecution" on behalf of the United States, thus indicating that it was not the purpose of this legislation 'to exclude a remedy by arrest and prosecution otherwise available to the United States. The trial court was thus right in ruling that the appellee was guilty of a criminal offense for which he could be arrested, although it should be observed the question is not without difficulty and that the delay of which the appellant complains is largely due to this difficulty and to his not unreasonable, but entirely untenable, claim, that an arrest for trespass was entirely improper.

The next question presented by the situation as to the duty of the person making the arrest is even more perplexing. Not only was the superintendent of the Indian agency obligated under the acts of Congress to arrest and remove trespassers from the agency, but the same obligation was imposed upon him by the Ft. Bridger Treaty with the Indian tribes occupying the particular reservation under consideration. This treaty provides as follows:

"Article I. * * * If bad men among the whites * * * shall commit any wrong upon the person or property of the Indians, the United States will * * *

proceed at once to cause the offender to be arrested and punished according to the laws of the United States * * *.

"Article II. * * * and· the United States now solemnly agrees that no persons * * * shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians * * *." (15 Stat. 673, 674.)

In order to determine the duty of appellants in the premises we must recur to the act of 1834, supra. In the well considered opinion by United States District Judge Dunby, it is held that it was the duty of the military under this law to turn the arrested person over to the United States Marshal. See United States v. Crook (D. C.) 179 F. 391; United States v. Corwine, 25 Fed. Cas. page 671, No. 14871. These sections in the law of 1834, supra, so construed in regard to the removal of persons from Indian country by the military, are continued in a somewhat modified form in title 25 USCA §§ 222, 223, 224. It will be observed that by the provisions of section 223, persons so apprehended are to be conveyed immediately from the Indian country by the nearest convenient and safe route to the civil authority of the territory or judicial district in which said person can be found to be proceeded against in due course of law. By section 224 the removal is to occur within five days of the arrest. Assuming, then, that the duty of the military officers is fully completed when the prisoners are turned over to the United States Marshal, it remains to consider whether, where the arrest is made by the Indian Commissioner, or his representatives, or chief of Indian police without the aid of the military authorities, the obligation of such persons is to take the arrested person before the nearest magistrate, or whether the duty is fulfilled when the officers of the reservation deliver the person to the United States Marshal, or other civil authorities, as would be the case in the event of an arrest by a private person at common law. 5 C. J. § 71, p. 432; see, also, Idaho Compiled Statutes of 1919. The power of the Indian police is derived from the Commissioner of Indian Affairs who is charged by Congress with the responsibility for the arrest and removal of trespassers upon Indian reservations. Section 104 of the Regulations of the Indian Office provides for the organization and duties of the Indian police force. Section 106 provides:

"Arrests for offense against state and federal laws cognizable in state and federal

courts, must in all cases, be made in conformity with the laws applicable."

In the case at bar the arrest was for an offense against a federal law, cognizable in a federal court, and the question is what law is applicable to the arrest within the meaning of the rule. In view of the fact that the Indian Commissioner may act either through the military authorities or through the Indian police directed by him, it would seem fairly clear that the obligation is the same in either event, namely, to remove the offender from the reservation and turn him over to the "civil authorities." In the case at bar, this was done. The prisoners were turned over to and accepted by a deputy sheriff for safekeeping. The United States Commissioner had no other provision for detaining such offenders and the Indian police had no place of detention at his disposal. It is reasonable to conclude that a part of the duty of the Indian officer making the arrest was to furnish the civil authorities with information upon which they could prosecute the offender. This would be most appropriately done by making deposition or complaint before the United States Commissioner. In arriving at this conclusion, we have not overlooked the fact that section 595, 18 USCA in addition to defining the duty of the marshal and deputy to bring prisoners before a magistrate, also imposes that duty upon other "officers." In the case of United States v. Mullin (D. C.) 71 F. 682, it was held that a member of the Indian police, executing the written orders of the Indian agent to remove trespassers from the reservation was not an officer of the United States within the meaning of Rev. Stat. 5398 (18 USCA § 245), imposing a penalty for resisting an officer of the United States. It would seem to follow for the reasons stated in that opinion that he is not an officer within the meaning of section 595, supra, however, this matter need not be conclusively determined for the reason that section 595 provides for an arrest upon a warrant and this arrest was without a warrant, and furthermore, the law with relation to the arrest of trespassers upon an Indian reservation deals exclusively with an arrest at the instance of the superintendent without a warrant from a magistrate. The special or specific law or regulation dealing with such subject is controlling in any event as against the general provisions of section 595, as was said by the Supreme Court in U. S. v. Nix, supra:

"The object of this statute was manifestly to amend Rev. Stat. § 829, which provided that the mileage of the marshal for transportation of prisoners should be computed from the place where the process was served to the place where it was returned. This statute provides that he shall be taken to the circuit court commissioner nearest the place of arrest, regardless of the fact by whom the warrant was issued. Inasmuch as the later act is a general one, applicable to marshals generally throughout the country, we do not think it was intended to repeal or interfere with the former act, providing specially for persons charged with any offense or crime in the territory of Oklahoma, and that in all cases, whether the crime was committed against the territory or the general government, the accused shall be taken before a commissioner whose office is nearest to the place where the offense or crime was committed.

"The rule of statutory construction is well settled that a general act is not to be construed as applying to cases covered by a prior or special act upon the same subject. On this principle we held in Townsend v. Little, 109 U. S. 504, 3 S. Ct. 357, 27 L. Ed. 1012, that special and general statutory provisions may subsist together, the former qualifying the latter. See also Churchill v. Crease, 5 Bing. 177; Magone v. King, 2 C. C. A. 383, 51 F. 525, and cases cited; State v. Clarke, 25 N. J. L. 54."

We therefore conclude that when Jensen delivered his prisoner to the sheriff and at once informed him and the United States commissioner of the charge against him, and then and there offered to make oath before the commissioner to a deposition or complaint to that effect, he was not liable for any delay thereafter due to the doubt or uncertainty of the commissioner, and that for this reason the motion for a directed verdict should have been granted.

Judgment reversed.